29 C.C.P.A. (Patents)

### KRATZ et al. v. CALVERT.

#### Patent Appeals No. 4581.

Court of Customs and Patent Appeals.
June 15, 1942.

Zabel, Carlson, Gritzbaugh & Wells, of Chicago, Ill. (Edward C. Gritzbaugh and Foster York, both of Chicago, Ill., of counsel), for appellant.

Pennie, Davis, Marvin & Edmonds, of New York City (Clarence M. Fisher, of Washington, D. C., R. H. Waters, Akron, Ohio, Frank E. Barrows, of New York City, Gordon C. Mack, of Akron, Ohio, and Roger T. McLean, of New York City, of counsel), for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

GARRETT, Presiding Judge.

This is an appeal from the decision of the Board of Appeals of the United States Patent Office affirming that of the Examiner of Interferences awarding priority to appellee in an interference proceeding declared between applications for patents. The subject matter involved relates to rubber hydrochloride products and the method of their manufacture.

The invention is defined in six counts (four for the method and two for the product) of which Nos. 4 and 6 are illustrative. These read:

"4. The method of increasing the transparency and clarity of a sheet or film prepared by casting a rubber hydrochloride solution onto a smooth surface and drying the same, which comprises applying to said sheet or film a solution of a transparent film forming material including an end product obtained by the reaction of rubber and a halide salt of an amphoteric metal in a solvent that is not a solvent for rubber hydrochloride and evaporating said solvent therefrom to leave a continuous relatively thin pellicle over said rubber hydrochloride sheet or film.

"6. Thin, transparent, flexible, self-sustaining sheet or film material suitable for wrapping purposes, comprising super-imposed films integrally bonded together, one of said films being composed largely of rubber hydrochloride and another of an end product obtainable from the reaction between rubber and tin tetrachloride."

The case is associated, in a sense, with the cases of Winkelmann v. Calvert and Calvert v. Winkelmann (cross-appeals hereinafter referred to as the Winkelmann and Calvert cases) involved in interference No. 74,296, decided concurrently. 129 F.2d 536, 29 C.C.P.A., Patents, ——. The record in those cases, so far as pertinent, was introduced as a part of the record in this case. Here, as there, the actual parties in interest are Marbon Corporation (stated to be a subsidiary of Borg-Warner Corporation) holding by mesne assignment from Marsene Corporation, as assignee of Kratz et al., on the one hand, and Wingfoot Corporation (stated to be a patent-holding affiliate of Goodyear Tire and Rubber Company, hereinafter referred to as Goodyear) as assignee of Calvert, on the other hand.

The Kratz et al. application was filed December 26, 1933; that of Calvert March 20, 1937. In order to prevail, therefore, it was incumbent upon Calvert's assignee to establish priority on his part by a preponderance of evidence.

The situation which exists here is an unusual one and it is proper at the outset briefly to sketch the history of the case and the relationship of the parties. The relationship is described at some length in our decision in the Winkelmann and Calvert cases, supra, and need not be restated here in detail.

It appears that Calvert had a "Goodyear Fellowship" donated by Goodyear in 1925 and 1926, and that he began work with that company as a research chemist in June 1926. He continued with the company in "chemist work" until about March 1, 1935, with the exception of about eight months, beginning in October 1928, during which months he was engaged in "graduate studies." Beginning in 1931 or 1932 his work was largely devoted to rubber hydrochloride development. About 1932 there were developed in the Goodyear plant certain rubber hydrochloride products which were sold by Goodyear under the respective trade names of "Pliofilm" and "Pliolite," or "Plioform," and, as we understand it, Calvert's work related, at least in part, to the production of transparent sheets or films (or to the improvement in transparency of sheets or films), "Pliofilm" and "Pliolite" being utilized in the process. He was a confidential employee of Goodyear on a full time basis.

It further appears that on July 5, 1933, Calvert addressed a letter to one Floyd E. Williams, vice president of Marsene Corporation relative to securing employment by that company. His letter is not of record and its contents are inferable only from the reply thereto, dated July 11, 1933, made by Williams, which is of record as Calvert Exhibit No. 84. In the reply he

was advised, "* * * we are now about ready to make a transparent sheet made from rubber and naturally would be interested in adding a chemist to our organization who has had experience with rubber compounds," and was invited to go to Gary, Indiana, July 15, 1933, for a conference. At or near that time he did go to Gary, and, either while there or at a date near that time, he accepted employment as a "consultant" by Marsene Corporation. This transaction was had without the knowledge of Goodyear in whose employ he continued until March 1, 1935, when he became a full time employee of Marbon Corporation as director of research. His salary as "consultant" began August 1, 1933, at the rate of $100 per month and continued for about a year during all of which time he remained a supposedly full time employee of Goodyear, located in Akron, Ohio. Arrangements seem to have been made for the payment of the $100 per month without having a Marsene check for it cleared through an Akron bank, and Williams appears to have visited and consulted with him at Akron, Ohio, at least twice during the month of September 1933.

It is obvious that the employment of Calvert as "consultant" by Marsene Corporation was a secret, or surreptitious, transaction which, upon the record here, must be said to have been discreditable to both employer and employee. It has served to surround this case (as well as other cases between the parties) with suspicion relative to the rights of Marbon Corporation (the actual party in interest as appellant here). See the Winkelmann and Calvert cases, supra; also Goodyear Tire & Rubber Co. v. Marbon Corporation, D.C., 30 F.Supp. 420.

It will be observed that our decision in the Winkelmann and Calvert cases, supra, practically turns upon the question of originality which was raised in the reasons of appeal in the appeal to us, it having been passed upon by the respective tribunals of the Patent Office.

In the instant case the question was raised in the Patent Office and both the Examiner of Interferences and the board discussed it in their decisions, but made no definite ruling upon it, although it is inferable from what they said that both believed that Kratz et al. derived the invention from Calvert. Inasmuch as they did not rule upon the question, however, appellants made no reference to it in the reasons of appeal stated in the appeal to us. Notwithstanding this omission, however, appellee has raised and argued the question before us, and for reasons hereinafter stated, we think it is involved and should be decided.

It may be said that it appears from the record that the connection of Kratz (the first party to the joint application) with the Marbon Corporation was severed sometime in 1935 and that his attitude toward the corporation at the time of the taking of the testimony in the case was unfriendly—counsel for appellants insist "extremely hostile." He was the only one of the joint applicants called as a witness. It is explained that Gebauer-Fuelnegg died in the latter part of 1934, some three years before the declaration of interference in December 1937. There is no explanation of the failure to call the third party, Moffett. We note that both Kratz and Moffet filed separate preliminary statements on behalf of the joint application, the text being substantially the same in each statement. Conception was alleged March 22, 1933, with diligence beginning on that date, and it was further alleged that the invention was disclosed to others on or about July 1, 1933; that a written description of it was first made on or about July 15, 1933, and that it was reduced to practice on or about July 15, 1933. A further statement is that Kratz "kept a diary recording the experiments made in connection with the development work at Gary, Indiana, the first date of said experiment in said diary being July 15, 1933."

The Examiner of Interferences held that Kratz et al. were confined to their filing date of December 26, 1933 for both conception and reduction to practice and the board approved his holding. Such evidence as was presented was thoroughly analyzed by the Examiner of Interferences and fairly epitomized by the board.

Briefly, it may be said that reliance was placed upon entries on two pages of a notebook which Kratz identified as having been kept by him. Photostatic copies of the pages were introduced in evidence as Exhibits G and H, respectively, the first being dated 7-15 and the latter 9-14 and 9-15. The board's comment upon these (omitting its references bearing upon originality) was, in part, as follows: "* * * On the first sheet a general reference is made to treating sheets of rubber hydrochloride with various formula

including Pliofilm and Pliolite to clarify the sheets. There is nothing more than a simple statement and no corroboration except by Williams who allegedly knew of the work of Kratz and no reference to tests or to Exhibit G. On the second sheet (Exhibit H) reference is made to a coating applied to a rubber hydrochloride sheet to clear up the sheet due to imperfections and also to a slight haze in the sheet which is cleared up by coating with Pliolite or Pliofilm dissolved in naphtha. There has been considerable argument as to the first sheet (Exhibit G). There has been some doubt raised as to when the last entry was made on the sheet inasmuch as the rest of the sheet is concerned with other matters. This notebook had interspersed copy sheets and the last entry on page 8 (Exhibit G) is disclosed on the copy sheet in a different color from the other entries on the same sheet. This leads to suspicion as to the time of entry."

Incidentally it may be said that Kratz was not asked anything about it being a joint invention, and testimony that it was such seems to be lacking.

[redacted] In any event, the meager testimony offered fails, in our opinion, to meet the requirements of the law as to definiteness and corroboration, and we agree with the tribunals of the Patent Office that appellants must be restricted to their filing date for both conception and reduction to practice if they were original inventors.

As has been stated, the application of Calvert here involved was filed March 20, 1937. This was a little more than two years after he had left Goodyear to become a full time employee of Marsene Corporation. Obviously, the application was filed by him at the instance of Goodyear (or its affiliate, Wingfoot), and not because of any direct interest on his part. The interest of Marsene Corporation by which he was employed at the time of its filing was adverse to that of Goodyear (or Wingfoot) and he stands, in a sense, in the singular attitude of being a party adverse to the application filed in his name, and his testimony must be considered with that attitude recognized.

While he made oath to the application, he refused to execute a preliminary statement, and there was filed and accepted in lieu thereof a statement executed by one Lorin B. Sebrell, research manager of Goodyear, giving "dates * * * based on laboratory reports made at [during] the time of Calvert's employment [by Goodyear] and * * * referred to in his laboratory notebook." In this statement conception and reduction to practice of all the counts was alleged in October 1932, and it was further asserted, inter alia, that in "October and November 1933, Calvert again coated film and carried out the process of the counts and made the products of the counts."

It was held by the Examiner of Interferences that the subject matter of counts 5 and 6 had been conceived and reduced to practice by Calvert "prior to July 15, 1933," and that conception of counts 1 to 4 had been established by Calvert "at least as early as September 15, 1933," all of which dates were prior to the filing date of the Kratz et al. application. The board was not so specific as to dates but said, after a review of the Calvert record: "We consider the showing of Calvert for conception and reduction to practice on dates at least earlier than the filing date of Kratz et al., December 26, 1933, is satisfactory."

We quote the following epitomization (omitting the references to pages of the record) by the board of the evidence upon which the tribunals of the Patent Office, as we interpret their decisions, reached their concurring conclusions:

"* * * On December 5, 1933, Exhibit A-8, Calvert made a report on the causes of turbidity in rubber hydrochloride film and in his conclusion made this statement:

"'Coating with Pliolite to eliminate surface irregularity (occasioned by the difficulty soluble portions) remains the logical method of obtaining a film of complete clarity.'

"We note that this report was checked by several officials of the Goodyear Company and reference is made to a report by witness Walton of November 27, 1933 (Exhibit A-9). This report was made to the assistant to the factory manager, R. P. Dinsmore. On December 26, 1933, Calvert submitted a report (Exhibit A-10) checked by several officials of the Goodyear Company and refers to the clarity of Pliofilm as greatly improved by dipping in dilute solutions of Pliolite or cellulose acetate. In the final paragraph of the report he refers to further experiments being continued on the preparation of clear films but states it is extremely doubtful whether a process of clarification, even if discovered, would be as economical as that of coating with Pliolite. He furnishes samples of such

material and recommends that a roll for special purposes be coated and serious consideration be given to this method.

"In addition we have a report (Exhibit A-11) of witness Walton, dated September 15, 1933, and an especially significant note to the effect,

" 'It was observed by Calvert and myself that cloudy R-H film could be made perfectly clear and of salable quality if coated by a thin film of Pliolite. * * * Calvert said that he had tried this stunt previously. C. W. Walton.'

"That statement seems to us to be satisfactory corroboration of Calvert's conception and reduction to practice. The testimony of Walton and Osterhof also supports the date of conception and reduction to practice by Calvert. While it ·is true that the Calvert notebook has no · particular reference to any such test and Calvert's testimony is not very definite as to his relationship with Gehman and Walton, his associates in the Goodyear Laboratory, it must be remembered that Calvert is a hostile witness for Goodyear. Gehman also has a record of tests of waterproofness of .this product, that is, the Pliofilm coated with Pliolite (Exhibit A-15, July 17, 1933) and he testified that the test was made for Calvert and that Calvert had told him he had found a coat of pliolite clarified the film. Calvert's testimony in this connection is also rather vague. Of course, Walton and Gehman as employees of the Goodyear .Company would be prejudiced in favor of the company but we think that Exhibit A-11 is especially effective as corroboration of Calvert's reduction to practice, or at least of reduction to practice inuring to the benefit of Calvert."

, The several parties mentioned as witnesses in the foregoing were employees of Goodyear, Walton and Gehman being co-workers with Calvert in the Goodyear laboratory.

Counsel for appellants have attacked the finding with much vigor. It is contended among other things that the work done by other Goodyear employees does not constitute a reduction to practice on the part of Calvert, and, in this connection, especial attention is directed to the work of Walton and Gehman and their testimony regarding same.

We have examined the pertinent evidence with care in the light of appellants' analysis of (and contentions concerning) it.

■ On the matter of reduction to prac-- tice we do not regard the evidence sufficient, under the rules of law applicable, to establish that the invention was reduced to practice in the Goodyear plant, by Calvert, nor do we think it sufficient to establish that it was reduced to practice for him in the Goodyear plant, even if his assignee be credited with the work of Walton and Gehman, a matter which under facts and circumstances different from those here existing might require more extensive consideration. We note that the Examiner of Interferences said that certain elements of weakness exist in Calvert's record and that the showing as to Calvert's "inventive acts is not all that may be desired," but added that the case "presents to some extent at least the aspects of an originality controversy." and that "additional light" was thrown upon Calvert's 1933 work by facts and circumstances incident to his association with the Marsene Corporation (predecessor of Marbon) during the earlier (July 1933) activities of Kratz et al.

It is our view that while the evidence may not be held sufficient to establish reduction to practice by Calvert in the Goodyear plant it is amply sufficient to establish conception on his part and we feel that in this case, as in the Winkelmann and Calvert cases, supra, the facts and circumstances proven lead inevitably to the conclusion that Calvert disclosed his conception to appellants and that whatever was done by them thereafter must inure to the benefit of the Calvert application. In other words, it must be held that appellants derived the invention from Calvert.

■ As has been stated, the question of originality was not referred to in the reasons of appeal stated in the appeal to us, nor was it discussed at any length in appellants' brief before us in this case. (It was fully discussed in their brief in the Winkelmann and Calvert cases, supra, which present an analogous state of facts.) Appellee, however, has raised the question and discussed it elaborately. It is a question ancillary to priority and appellee has the right to raise it and have it determined. Lorenz K. Braren v. George Horner, 49 F.2d 984, 18 C.C.P.A., Patents, 1408; Rollie B. Fageol v. Gabriel Midboe, 56 F.2d 867, 19 C.C.P.A., Patents, 1117; Chittick v. Lyons et al., 104 F.2d 818, 26 C.C.P.A., Patents, 1382.

In our decision in the Winkelmann and Calvert cases, supra, we recited the facts

which led us to the conclusion that the invention there involved was derived from Calvert. Many of those facts apply with equal force in the instant case and it is not necessary that they be restated here. Other facts and circumstances bearing upon the instant controversy appearing of record add to our conviction that the invention here involved like that involved in those cases was also derived from Calvert.

In view of our conclusion upon the matter of originality, it is unnecessary to discuss other questions raised in the reasons of appeal.

The decision of the Board of Appeals is affirmed.

Affirmed