49 CCPA

Edgar M. CREAMER, Jr., Appellant,

v.

Loren R. KIRKWOOD and Alton J. Torre, Appellees.

Patent Appeal No. 6797.

United States Court of Customs and Patent Appeals.

July 25, 1962.

Rehearing Denied Oct. 24, 1962.

Thomas M. Ferrill, Jr., Allen V. Hazeltine and Fordyce A. Bothwell, Philadelphia, Pa., for appellant.

Stephen H. Philbin, Fish, Richardson & Neave, New York City (A. Russinoff, Princeton, N. J., of counsel), for appellees.

Before WORLEY, Chief Judge, and RICH and SMITH, Associate Judges, and Judge WILLIAM H. KIRKPATRICK.*

WORLEY, Chief Judge.

Creamer, the senior party, appeals from the decision of the Board of Patent Interferences which awarded priority of invention of the single count in issue in Interference No. 88,783 to Kirkwood and Torre.

The interference involves Kirkwood and Torre patent No. 2,758,155, issued on August 7, 1956, on application Serial No. 248,776, filed September 28, 1951. The patent is assigned to Radio Corporation of America, the real party in interest, hereinafter referred to as RCA.

Appellant Creamer is involved in the interference on the basis of a reissue application [1] assigned to Philco Corporation, the real party in interest.

The invention in issue relates to a color synchronizing circuit for a color

---

\* United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate in place of Judge O'CONNELL, pursuant to provisions of Section 294(d), Title 28, United States Code.

1. Application Serial No. 662,960, filed May 24, 1957, for reissue of patent No. 2,771,508, issued November 20, 1956, on application Serial No. 223,245, filed April 27, 1951.

television receiver. The television system with which the invention is employed is described in the Kirkwood and Torre brief as follows:

"The color television system with which the present invention has been used became known in 1949 as the 'dot sequential' system. In this system, information regarding the primary colors (red, green, and blue) of the televised image is obtained, at the transmitter, by viewing the televised scene through a camera. The camera provides three video (picture) signals which represent, respectively, the red, green, and blue content of the scene. These signals are 'sampled' (detected) in succession at a high, predetermined rate, of the order of 3.58 megacycles (million cycles) per second, to produce a train of pulses respectively representative of the amounts of red, green, and blue in the image.

"When this train of pulses is filtered in the transmitter, the result is a 'subcarrier' wave whose frequency is equal to the sampling rate (3.58 megacycles per second). Each of the three color signals occurs on a different phase of the subcarrier wave. The phase of the subcarrier wave is indicative of the hue of the image (i. e., red, green or blue), and its amplitude indicates the saturation (i. e., the purity of the color). This subcarrier wave forms a part of the signal which is transmitted over the air. The transmitter also produces a color synchronizing 'burst', which is transmitted with the color subcarrier wave.

"At the receiver, the color information is obtained from the subcarrier wave by a corresponding sampling or demodulation process, thus recreating the original primary color video signals for application to a color image reproducing device.

\*　　\*　　\*　　\*　　\*

"To recover the color information carried by the color subcarrier wave, a color television receiver must include a source of continuous oscillations, at the same frequency as the received color subcarrier wave, for mixing with the color subcarrier in a color sampler or demodulator. It is important that the continuous oscillations be maintained at the same frequency as the received color subcarrier wave and at a fixed, predetermined phase relationship with the received color subcarrier wave, so that the respective color information signals can be selected. If this predetermined phase relationship is not maintained, the reproduced image will lack color fidelity.

"However, as in all electrical circuits, perfection is impossible, and there will be variations, including frequency variations. The normal tendency of an oscillator is to drift, or depart, from its specific frequency, because of changes in temperature, etc.

"The frequency and phase synchronism between the reference oscillations generated in the television receiver and the received color subcarrier wave is accomplished, by use of the 'bursts' of oscillations which are part of the transmitted signal. The bursts have the same frequency as the color subcarrier and are of fixed reference phase. Because the bursts occur between successive lines of picture information, they are unaffected by picture content."

The count, which corresponds to claim 7 of the Kirkwood and Torre patent, reads:

"1. In a color television system of the type wherein there is employed a subcarrier whose phase with respect to the phase of a reference signal burst is indicative of color information, a color synchronizing circuit for synchronizing a color receiver comprising in combination a color selector, a piezoelectric crystal cut to the frequency of said reference signal burst, means for

driving said color selector with said piezoelectric crystal and means for applying said reference signal burst across said piezoelectric crystal for periodically phasing said piezo-electric crystal oscillations with said reference signal burst."

Although the circuits provided by both parties fall within the terms of the count, they are not identical. For reasons which will become apparent, only the circuit employed by Kirkwood and Torre requires consideration here.

The Kirkwood and Torre patent discloses a color television receiver. That receiver employs a color synchronizing or color hold circuit in which an oscillator serving as a source of control oscillations includes an oscillator tube connected in series with a piezo-electric crystal.[2] The synchronizing bursts forming part of the composite color signal received from the transmitter are separated from the composite picture signal and applied across the crystal.

Kirkwood and Torre describe their circuit as follows in their brief:

"The object of the Kirkwood and Torre invention is to maintain, automatically, the receiver oscillator at the proper frequency and phase for selecting the color signals from the received subcarrier wave. This is done by the piezo-electric crystal control of the receiver oscillator.

"A crystal of the piezo-electric type has a specific frequency of mechanical vibration, predetermined by its physical structure, by cutting, etc. Such a crystal, used as the tuned circuit of an oscillator, will tend to force the oscillator to operate at the same frequency. Prior to the invention, it was common practice to use a crystal in an oscillator circuit, to hold its frequency to that of the crystal.

"The crystal is cut to oscillate at a frequency as close as practically attainable to the predetermined frequency of the bursts. Every time the received color synchronizing burst is applied across the crystal, the oscillator oscillations conform closely in frequency and in phase with the frequency and phase of the burst. The oscillations are employed in color selectors (color demodulators), to extract the red, green, and blue information from the color subcarrier, which information is then supplied to the receiver picture tube."

The board held that Kirkwood and Torre proved reduction of the invention to practice prior to Creamer's filing date. It also held that Creamer, although first to conceive, did not show reduction to practice prior to Kirkwood and Torre, and did not prove diligence to overcome the effect of his opponents' earlier reduction to practice.

However, the sole issue here is stated by Creamer in his brief to be whether Kirkwood and Torre proved they actually reduced the invention defined in the count to practice prior to Creamer's filing date. That date is April 27, 1951, when Creamer's original application was filed.

The record of over two thousand pages reveals that the history of the involved circuit of Kirkwood and Torre, referred to by the parties as a color hold circuit, commenced in April 1950 when RCA established an engineering section with Kirkwood in charge and Torre a member, to work on color television projects. The initial projects were the design and development of a color television adapter[3] and a new color television receiver.

---

2. Appellees' brief states:

"Piezo-electric crystal" means a mechanical-electrical crystal, which will mechanically vibrate when a suitable signal is applied to it and will produce sustained oscillations of the same frequency and phase as the signal.

3. The adapter was to be a complete color television receiver made by modifying and augmenting the chassis of an existing black and white television receiver.

The board found that Kirkwood and Torre, in connection with their work assignments, conceived the color hold circuit involving the subject matter of the count by May 16, 1950. Creamer does not question that finding.

During the same month, the Kirkwood and Torre circuit was disclosed to Kelly, a member of the color television section who was then working on burst keying and color synchronizing circuits. Kelly testified that, in July 1950, the circuit was tested with other circuits for performing the same function, including an A.F.C. (automatic frequency control) system on which he himself worked, and that it outperformed the other circuits and was chosen for use in the receivers made in 1950.

The Kirkwood and Torre circuit was then incorporated in the color receiver designated an adapter, made by Obenland, another engineer in the color television section, and in the new color receiver. In late July or early August of 1950 both receivers were field tested in Silver Spring, Maryland, with color signals broadcast from a television station in Washington, D. C. operated by the National Broadcasting Company, an affiliate of RCA.

Wlasuk, an engineer employed by the RCA Service Company, testified that, during those tests, he observed the sets while they were receiving very high frequency (VHF) signals and also while receiving ultra high frequency (UHF) signals. He testified that observation was made of the effects of variations in line voltage and different kinds of interference and of the faithfulness of the color reproduction. Wlasuk further stated that the performance of the receivers was "real good" and, in his opinion, "commercially acceptable" and that the color stayed good so long as the horizontal and vertical scanning frequency stayed good within the receivers. He conceded that there were certain instances where there was a change of hue but attributed that effect to variation in the color subcarrier at the transmitter, explaining that, when the same effect was observed on the two receivers at once, it appeared that the cause was at the transmitter.

In about the middle of August 1950, the receivers were taken to the Trans-Lux Building in Washington, D. C. for demonstrations to RCA executives, using the same transmitter. Witnesses testified that the pictures received during the tests were "very good" and that the performance as to color synchronization was "adequate."

During a period of approximately two weeks commencing December 5, 1950, additional demonstrations of color television receivers, including the Kirkwood and Torre color hold circuit, were held at the same location. The demonstrations were witnessed by a large number of people, including licensees of RCA, various people in the industry, members of Congress and members of the press. Kirkwood and Torre introduced testimony that the receivers performed satisfactorily in those demonstrations and produced excellent pictures which were in full color and had quite good color fidelity.

Following the December demonstrations, RCA decided to carry forward development work on improving "a few objectionable characteristics" noted in the demonstration models. Apparently the only one of those characteristics pertinent here was noted in a report to management as follows:

"1. Color phase appears too critical with 3.58 megacycle frequency in the transmitter."

The Kirkwood section then started work in January of 1951 on a color receiver in which high quality performance was sought without regard to complexity or cost of components. A different color hold circuit was developed, which circuit apparently would provide stable operation over a wider range of variation in the frequency of the color subcarrier in the transmitter than did the Kirkwood and Torre circuit used in the demonstrations in August and December.

After evaluating the evidence, the board concluded:

"From the testimony and exhibits it seems to be established that as of the early part of August, 1950 the invention in issue had been determined to be superior to the previously used circuits which used an AFC control for an oscillator which was not crystal controlled. Moreover, the tests in Silver Spring in early August 1950 were sufficiently successful that the sets which used the Kirkwood and Torre circuit were demonstrated to RCA management the same month. Further the latter demonstrations achieved a sufficient degree of success that production of additional sets was authorized and that a more extensive demonstration using those sets was planned and subsequently staged in December of 1950."

The board then held that Kirkwood and Torre had proved actual reduction to practice by the middle of August 1950.

Creamer urges that Kirkwood and Torre have not proved that their demonstrations in Silver Spring and Washington in 1950 constituted reduction to practice because they have not shown that the transmitter subcarrier frequency, varied through what he calls a "normal" range of variation during reception of the transmitted signals and usable reproduction of color pictures. According to Creamer, the evidence does not preclude the possibility that RCA took extraordinary measures "to keep the signal produced by the transmitter of such character to enable their receivers to provide usable picture reproduction." Production of a usable picture while such measures were taken, he urges, would not show that the color hold circuit was operating *"in the intended manner to accomplish the intended purpose*—in this instance that the Kirkwood et al. circuit maintained color synchronization during ordinary variations in the subcarrier frequency."

Creamer also contends that the use of a more complex AFC type of color hold circuit, instead of that of Kirkwood and Torre, in receivers built after the December 1950 demonstrations indicates that the demonstrations amounted to an abandoned experiment rather than a reduction to practice.

The application on which the Kirkwood and Torre patent issued was copending with Creamer's original application. The burden on Kirkwood and Torre, therefore, is to prove priority by only a preponderance of the evidence rather than beyond a reasonable doubt. Archer v. Papa, 46 CCPA 835, 265 F.2d 954.

We think they have met that burden in proving reduction to practice by the middle of August of 1950, as found by the board. The favorable reports of the witnesses on the July and August tests and demonstrations are reinforced by the circumstances as indications of successful operation of the color hold circuit of Kirkwood and Torre. Thus, the tests in Silver Spring resulted in the subsequent demonstration of the sets employing that circuit before RCA management later in August of 1950. The success of the latter demonstration is indicated by the use of the same circuits in the sets demonstrated publicly in December of the same year. As indicated by appellant in his brief, the 1950 demonstrations were prompted by RCA's concern with making an impressive showing of its dot sequential system of color television "which was then in desperate competition before the Federal Communications Commission with the Columbia Broadcasting System field sequential system." It is difficult to believe that RCA would have continued to use the Kirkwood and Torre color hold circuits in receivers for the public demonstrations if its previous performance had left doubts it would function properly.

In 1950, color television does not appear to have been in commercial operation and the RCA dot sequential system had not then been approved by the Federal Communications Commission. There was no established arbitrary "normal"

range of variation of subcarrier frequency of the color transmitter. Whether the variation of subcarrier frequency was controlled through monitoring of the transmitter during the demonstrations is not material here. Receivers embodying the Kirkwood and Torre circuit to perform the function of synchronization did operate satisfactorily through whatever range of subcarrier frequency variation did actually occur. So far as the record is concerned, the range of variation which was attained at the transmitter during the 1950 demonstrations may be considered the normal range for the purpose of reduction to practice at the time and under the existing conditions.

It must also be remembered that the Kirkwood and Torre circuit was selected for use in the receivers after Kelly's tests wherein it outperformed other circuits for performing the same function. Its selection in this manner is a definite indication that it was considered suitable for operation over the range of subcarrier frequency to be expected even before the demonstrations were conducted.

The decisions in Applegarth, Jr. v. Wilson, 33 CCPA 1268, 156 F.2d 373, and Landon v. Ginzton et al., 41 CCPA 950, 214 F.2d 160, cited by Creamer, involved factual situations distinguishable from the present circumstances. The tests held not to constitute reduction to practice of the circuit in issue in the Applegarth case involved laboratory work rather than use of the circuit as an essential component of a device which operated satisfactorily. Further, the counts in Applegarth were found by the court to include language demonstrating the necessity for comparative tests which were not made. The tests deemed insufficient to constitute a reduction to practice in Landon were found not to reveal or demonstrate qualities which the record showed were relied upon to impart patentability to the counts.

Concerning the failure of RCA to use the Kirkwood and Torre circuit after 1950, the board stated:

"Nor do we believe that the further development of color television by RCA in which the Kirkwood and Torre circuit was not used can relegate the August and December demonstrations to the status of abandoned experiments. That circuit was found to perform its intended function for those demonstrations, at least within certain limits, and the later development of other circuitry which was more tolerant of variations in the transmitted subcarrier frequency cannot properly be held to change reasonably satisfactory performance into failure. It is well settled that commercially satisfactory performance is not necessary to an actual reduction to practice. Hildreth v. Mastoras, 257 U.S. 27, 42 S.Ct. 20, 66 L.Ed. 112; Tansel v. Higonnet et al., 42 CCPA 732, 1955 C.D. 46, 215 F.2d 457; and Leichsenring v. Freeman, 26 CCPA 1153, 1939 C.D. 540, 103 F.2d 378; Further, we think that the standard for successful operation to amount to an actual reduction to practice is less stringent in the early stages of development in an art as in the present case where during the period under consideration there was no production of commercial color television receivers."

We find no error in that statement. Stevens A. Bennett v. James E. Fitzgerald, 18 CCPA 1201, 48 F.2d 917, relied upon by Creamer in support of the argument that the subsequent use of a different color hold circuit indicates the demonstrations in 1950 constituted an abandoned experiment, gives little comfort to him. That case states that "if reduction to practice is established, other circumstances or conduct of a party would not warrant" a contrary finding. We are satisfied that the demonstrations in 1950 constituted a reduction to practice of the Kirkwood and Torre circuit.

The decision of the board is affirmed.

Affirmed.

MARTIN, J., did not sit or participate because of illness.