58 CCPA

**John J. GOODRICH, Appellant,**

v.

**Arnold C. HARMSEN and Burke P. Lokey, Appellees.**

**Burke P. LOKEY, Appellant,**

v.

**Arnold C. HARMSEN and John J. Goodrich, Appellees.**

**Patent Appeal Nos. 8463, 8464.**

United States Court of Customs and Patent Appeals.

May 6, 1971.

As Corrected May 25, 1971.

Baldwin, J., concurred and filed opinion.

378

---

No. 8463:

Francis J. Hone, New York City, for appellees.

Raymond J. McElhannon, Paul E. O'Donnell, Jr., New York City, for appellant, John J. Goodrich.

Robert E. Isner, New York City, for Arnold C. Harmsen.

No. 8464:

Francis J. Hone, New York City, for appellant Burke P. Lokey.

Raymond J. McElhannon, Albert C. Johnston, New York City, for appellees. Robert E. Isner, New York City, for Arnold C. Harmsen, Paul E. O'Donnell, Jr., New York City, for John J. Goodrich.

Before RICH, ALMOND, BALDWIN, and LANE, Judges, and Re, Judge, Customs Court, sitting by designation.

1. Serial No. 302,581, filed August 16, 1963.

2. Serial No. 216,388, filed August 13, 1962.

RICH, Judge.

These appeals are from the decision of the Board of Patent Interferences in a three-party interference involving only pending applications in which priority was awarded to Harmsen,[1] the juniormost party, as against Lokey,[2] the intermediate party, and Goodrich,[3] the senior party. We reverse and find that Lokey is entitled to priority on the present record.

## THE INVENTION

The subject of the interference is a multi-ply, gusseted, stepped-end, pinch-bottom paper bag. Fig. 20 of Goodrich's application is reproduced below. In this

figure, the *plies* as well as the gussets and front and back surfaces of the bags are horizontally (i. e., from bottom to top in Fig. 20) stepped, a feature not

3. Serial No. 169,287, filed January 29, 1962.

recited by the counts.[4] As far as stepping in what we have termed the horizontal direction is concerned, the counts require only that the front wall, the front part of the gussets, the back part of the gussets, and the back wall be stepped. However, it should be noted that the fold line 102 (center front of Fig. 20) is below the top of the front surface as permitted by count 2,[5] whereas count 1 calls for "the axis of closure of the end * * * [to be] substantially coincident with the upper edge of the front wall * * *."

## THE DECISIONS BELOW

In its initial decision, the board held that Harmsen had conceived and reduced to practice in 1957, that Lokey had conceived in 1960 and reduced to practice in 1961, and that Goodrich, who took no testimony, was restricted to his 1962 filing date. On reconsideration, the board held that Harmsen had not "abandoned, concealed or suppressed" his invention within the meaning of 35 U.S.C. § 102(g), as contended by both Goodrich and Lokey, and reaffirmed its holding that both Harmsen and Lokey had reduced the invention to practice prior to Goodrich's filing date, rejecting an argument made by Goodrich which in substance was that "proof of commercial utility should be a requirement for a reduction to practice," to quote the board.

## OPINION

Although the parties have argued a number of other issues, our determination of priority requires us to consider only (I) Harmsen's conception, (II) the contention that Lokey did not conceive the invention but derived it from Harmsen, and (III) Lokey's reduction to practice. Accordingly, we will discuss only those issues and in that order.

4. Count 1 does not call for stepping of the plies; count 2 calls only for "longitudinal" (i. e., from left to right in Fig. 20) stepping of the plies.

5. Which reads in relevant part: "said end of the tube including all of said over-

## I. *Harmsen's Conception*

At the time when Harmsen asserts he conceived and reduced to practice the invention in issue, he was manager of a multi-ply bag manufacturing plant located in Mobile, Alabama, and owned by Arkell & Smiths, a manufacturer of paper products with its principal office in Canajoharie, New York. He was and always had been employed in production rather than in research, and his professional education consisted of three years of study in civil engineering at Purdue University. His own testimony and that of his witnesses indicate the limited facilities for product development with which he had to work in Mobile. Nevertheless, the evidence does indicate that in February of 1957 Harmsen conceived some sort of stepped-end, open-mouthed bag and that he thought enough of his conception to prepare a notarized conception statement concerning it and to have made up and have sent to his superiors in Canajoharie a dozen or so bags embodying his idea, whatever it was. Additionally, a letter to Harmsen from the home office following receipt of the embodiments of his idea indicates that Harmsen's superior was favorably impressed by the bags, although the letter included a suggestion for modification thereof "to prevent sifting out of the corner." The superior considered Harmsen's idea to be novel although his letter states that Harmsen's bags were "close in construction" to bags then being manufactured by the company at its Hudson Falls, N. Y., plant.

Harmsen produced neither examples of the bags sent to Canajoharie nor of a later-made group of bags which the board found to have been the necessary reduction to practice of his conception. His contemporaneous physical evidence consists of the above-mentioned notarized conception statement, a copy of a

lapped portions and surfaces being folded against said front surface and selectively adhered in position to form said assembled bag end."

contemporaneous letter from Harmsen to his superior at Canajoharie, the above-mentioned letter from his superior about a month later acknowledging receipt of the bags, and three pages of a copy of a letter (the contents of which are unimportant aside from the date since it was used only for the paper) which had been cut and folded to resemble one end of a three-ply bag embodying the invention in issue (Exhibit 3).

In the notarized conception statement, Harmsen stated in relevant part that:

> On the date of February 14, 1957, I received [Harmsen testified he meant "conceived"] an idea for the manufacture of a stepped end sewn open mouth bag, both flat tube and with a gusset. This bag incorporates the following features:
>
> 1. The ends of the bag are shingled in such a way that they can be folded over and either pasted or sewn through * * *.

Harmsen's contemporaneous letter is similarly vague, stating only that he had had "a couple of ideas with regard to a stepped end sewn open mouth bag, both flat tube and gusset bag," and the letter to Harmsen from his superior refers only to "the stepped-end bags which you submitted" without further description. This point is critical, for the evidence shows that stepped-end, open-mouth bags of various constructions, either pasted or pasted and sewn, were known in the industry well before the date of Harmsen's alleged conception. Additionally, we note that in both Harmsen's notarized conception statement and his letter to Canajoharie he states that his idea is employable with either flat-tube or gusseted bags, which militates against the conclusion that he was writing about bags

conforming to the counts in issue because stepped front and rear gussets set between stepped front and rear bag walls are essential limitations in the counts. Thus, Harmsen's case really comes down to his Exhibit 3 letter-model and to his testimony and the testimony of his witnesses, taken more than nine years after the fact.

Harmsen's Exhibit 3 is a crude but recognizable model of one end of a cut and folded bag blank embodying count 1. It consists of three pages of a copy of a letter to Harmsen dated January 23, 1957, and Harmsen testified that he had made it himself and used it

> * * * to show my foreman and supervisors and especially the boy who was going to make up the sample bags how he wanted the bags made.

Both the foreman who made up the samples for Harmsen and the assistant superintendent of the plant, to whom Harmsen showed the model from which the sample bags were made, testifying in 1966, identified Exhibit 3 as the model they had seen in February or March of 1957. Additionally, (1) the assistant superintendent, the man who had been vice president in charge of sales at Arkell & Smiths at the time Harmsen had submitted his sample bags,[6] and the then-secretary to Mr. Harmsen's immediate superior at Canajoharie all testified that they had seen Harmsen's sample bags and that they had the same end configuration as exhibit bags prepared for trial and clearly meeting count 1, and (2) during the taking of his testimony the foreman [7] cut a gusseted bag blank in a manner meeting count 1 and testified that he had cut the sample blanks for Harmsen back in 1957 in the same manner, to the best of his recollection.

---

6. It is perhaps worthy of note that at the time of their testimony both Mr. Harmsen and the former vice-president in charge of sales at Arkell & Smiths were employees of Gilman Paper Company and that the former foreman at Arkell & Smiths' Mobile plant who actually made up Harmsen's samples also had been em-ployed for a time by Gilman Paper Company after leaving Arkell & Smiths, although he was no longer a Gilman employee by the time his testimony was taken.

7. See footnote 6, supra.

However, we note again that more than nine years had passed since these individuals had seen the model or the sample bags themselves. Harmsen asserted that during those nine years, the model made of letter paper (Exhibit 3) identified by his former associates had been "folded in a book that * * * [he] had in a personal file" which he had kept at home for much of the time. Under all the circumstances, we do not think the board was justified in relying so heavily upon either the authenticity of the model, American Tri-Ergon Corp. v. Coe, 30 F.Supp. 83, 85, 180 (D.D.C. 1939), or upon the recollection of Harmsen's witnesses, Washburn & Moen Mfg. Co. v. Beat 'em All Barbed Wire Co., 143 U.S. 275, 284–285, 12 S.Ct. 443, 36 L.Ed. 154 (1892) ("The Barbed Wire Patent").

██ *Summary:* As junior party, the burden was on Harmsen to establish that his conception of the invention of the counts was prior to his rivals', and, in our judgment, he failed to carry his burden because his evidence of conception was too weak. There were no drawings, no original samples extant, the letter paper model had allegedly been in the sole custody of Harmsen, and no step had been taken over nine years to obtain patent protection.[8]

## II. *Lokey's Conception*

Goodrich, the senior-most party, has expressly conceded, "for purposes of this appeal," and for the obvious reason it· is essential to part of his case against Lokey, that the board did not err in awarding Harmsen a 1957 conception date. However, Goodrich argues: (1) that Harmsen never actually reduced to practice (his filing date being safely after Goodrich's) and that he did not become diligent in seeking patent protection until after Goodrich's filing date,

and (2) that Harmsen disclosed his conception to Lokey before Lokey claims to have independently arrived at the idea.[9] Thus Goodrich seeks to prevail over the other two parties.

Lokey denies derivation and argues that Goodrich has no standing to raise the issue of derivation from Harmsen (1) because Goodrich did not expressly refer to the issue of derivation in his reasons of appeal and (2) on the ground that

> * * * it is well established that each party to an interference must prevail on the basis of his own evidence of prior invention and that an assertion of prior invention by a different party will not be considered. Schwarzenbek v. Evering, 357 F.2d 1018, 53 CCPA 1152 (CCPA 1966).

As to the first of Lokey's no-standing arguments, Goodrich asserts that the following two ᐧof his reasons of appeal "clearly cover this issue of whether Lokey was an *original and independent conceiver* of the invention in issue":

> 9. The Board erred in holding that Lokey had conceived the invention of the counts by June, 1960.
>
> *       *       *       *       *       *
>
> 15. The Board erred in holding that Lokey conceived the invention of the counts at any date prior to January 29, 1962.

Additionally, Goodrich cites Kratz v. Calvert, 129 F.2d 542, 29 CCPA 1097 (1942), which held that an *appellee* had the right to argue in his brief an issue *appellants* had not included in their reasons of appeal because "It is a question ancillary to priority and appellee has the right to raise it and have it determined." 129 F. 2d at 546. Id., 29 CCPA at 1103. While we agree with Goodrich that his general allegations of non-conception were suffi-

---

8. On cross-examination, Harmsen testified that he had gone to a patent attorney to initiate his application only after the assignees of both Lokey and Goodrich had announced to the trade the availability of bags embodying the invention in issue.

9. Goodrich does not challenge Lokey's conception other than by saying Lokey derived the invention from Harmsen. Clearly, as of the date found by the board, Lokey had the conception from somewhere—either from Harmsen or from his own imagination.

cient to apprise Lokey that all aspects thereof might be put in issue by Goodrich, we do not agree that Kratz v. Calvert supports the proposition that an *appellant* has the right to raise in his brief an issue not included even generally in his reasons of appeal. The considerations which led the court in Kratz v. Calvert to permit the *appellee* to secure the determination of an issue omitted from the appellant's reasons of appeal are not present in the case of an *appellant* who wishes to secure determination of an issue not raised by his own reasons of appeal, even though that issue might be ancillary to priority.

As to Lokey's second no-standing argument, Schwarzenbek v. Evering, supra, states only that

> An attempt to establish third party inventorship could avail Schwarzenbek et al. nothing in this proceeding since, as they concede in their brief, "a party to an interference who is otherwise entitled to priority may not be defeated by his adversary on the basis of proof that the invention was in fact made by *a third party, a stranger to the interference* * , * *." [Id. at 1156 n. 3, 357 F.2d at 1021 n. 3, 53 CCPA at 1156 n. 3. Emphasis supplied.]

Here, Harmsen is hardly "a stranger to the interference." It is unquestionably true that either party to a two-party interference has standing to assert that the other *derived* the invention in issue from it, 1 Rivise & Caesar, *Interference Law and Practice* § 113 (1940), and we see no reason in law or logic why any party to an interference involving three or more parties should not be able to show that a second party derived the invention from a third *party*, if proof of that fact will advance the prover's case. Certainly that result will lead to an overall saving of administrative and judicial effort, and it does not seem to be inconsistent with the narrow scope of present interference practice. However, having held for Goodrich on the question of his standing to raise the issue, we hold

against him on the merits of the issue of derivation.

Harmsen and the foreman who had made up his bag samples both testified that Harmsen had revealed and explained his invention to Lokey at a business meeting several months before the date Lokey asserts for his conception. Harmsen even testified that at that meeting he

> * * * picked up * * * a bag blank we had there and tore out the corner similar to the way we had made these bags to show him what I was talking about with regard to the step pattern and how we could fold it over and paste it down rather than sew the bag.

Lokey testified that he recalled a business meeting which seems to correspond to the one described by Harmsen and his former subordinate, but that

> The only bag construction that we discussed were the conventional stepped end contruction and the sewn construction.

These two assertions are not necessarily inconsistent. Perhaps Harmsen did show Lokey his invention, and perhaps Lokey dismissed it as a "conventional stepped-end construction" or an obvious variant thereof. We really cannot tell. But one thing is clear: Goodrich has not carried the burden faced by one who asserts derivation of an invention by another. Since proof that Harmsen had sufficient conception of the invention to have disclosed to Lokey so as to make Lokey a "deriver" is fundamental to Goodrich's case, we hold that Goodrich has failed to establish that Lokey derived the invention from Harmsen.

■ *Summary:* As one party to a multi-party interference, Goodrich was entitled to raise the issue of Lokey's derivation of the invention from Harmsen. However, Goodrich failed to establish that Harmsen in fact had sufficient conception of the invention of the counts which he could have transmitted to Lokey

### III. *Lokey's Reduction to Practice*

The board held that Lokey's employer and assignee, West Virginia Pulp and Paper Company, made and tested bags conforming to the counts in March 1961, long prior to Goodrich's filing date. The tests were part of a planned development which is well documented in the record by reports and drawings introduced in the course of testimony by Lokey and his fellow workers. The board concluded that Lokey had an actual reduction to practice in March of 1961 as the result of successful tests.

Harmsen does not attack Lokey's reduction to practice. The attack comes only from Goodrich who contests the board's holding on the ground that Lokey's assignee's tests, which were extensive and carried out at two different company research laboratories, first in November-December 1960 and later in March 1961, produced inconclusive results and did not result in a "contemporaneous conviction of success" on Lokey's part. Goodrich's arguments take on a variety of forms and cite a number of cases but, on final analysis, the arguments reduce to the contention that the tests were not successful. Lokey points to testimony and records which he says show the contrary and, as indicated above, the tests are well documented. Several witnesses, including experts in the bag field, testified about them.

We have examined the evidence and considered the opposing contentions with care and find no reason to disagree with the conclusion of the board that Lokey reduced to practice in March 1961. As a contraindication to Goodrich's contention that the tests were not successful and so do not establish actual reduction to practice, Lokey points out that promptly after some further tests in May 1961 West Virginia Pulp and Paper Company decided to proceed with a program for commercial development of a packaging system utilizing the Lokey bag invention.

Both Lokey and Goodrich have cited the case of Larsen v. Marzall, 90 U.S. App.D.C. 260, 195 F.2d 200 (1952). In that case the court, after noting that to products of the kind here involved the "With some products * * * actual use may be necessary to show reduction to practice" whereas "With others * * laboratory (or similar) tests may be sufficient," distinguished the two situations by asking: .

> First, do the tests employed—in actual use or in the laboratory—show that the product will serve the purpose for which it is designed, and show this so conclusively that practical men will without more take the risk of putting it into immediate commercial production and use? Second, would the time, effort and expense of conducting actual field experiments be unjustified because of the small likelihood that they would yield substantially greater knowledge concerning the product's performance? Id. at 202.

Finding both criterial to have been satisfied, the court held that Larsen had actually reduced his invention to practice before the effective date of a reference. Answering arguments by Harmsen based on the above quotation, the board held that "Commercially acceptable structure or operation is not necessary for a reduction to practice," citing Hildreth v. Mastoras, 257 U.S. 27, 42 S.Ct. 20, 66 L.Ed. 112 (1921); Tansel v. Higonnet, 215 F.2d 457, 42 CCPA 732 (1954); and Creamer v. Kirkwood, 305 F.2d 486, 50 CCPA 715 (1962). We agree with the board. We do not read Larsen v. Marzall as requiring, as Goodrich seems to contend, that there is no actual reduction to practice unless testing has proceeded to the point where the invention is actually ready to be put into *commercial* production *without* further testing; rather the court was saying that the tests should suffice to persuade practical men to take the *risk* of commercializing the invention—"that the product will serve the purpose for which it is designed" and therefore *can* be commercialized. In the nature of things, testing goes on throughout the process of "commercializing" and often continues after a product is on the market where it usually receives its severest test. As

point at which there is an actual reduction to practice is often, if not usually, somewhat short of the point where the product reaches its commercial form.

■ *Summary*: Lokey successfully tested his embodiments of the invention of the counts and therefore had an actual reduction to practice thereof in March 1961, prior to Goodrich's filing date.

## DECISION

The award of priority by the board to Harmsen is reversed.

Reversed

BALDWIN, Judge (concurring).

It is my belief that the party Harmsen could not prevail in this case even were his evidence convincing beyond a shadow of a doubt. The law as announced by this court in Brokaw v. Vogel, 429 F.2d 476, 57 CCPA 1296 (1970) is controlling. For this reason I do not join the majority's disparagement of Harmsen's evidence. I agree with the rest of the opinion and therefore concur in result.