Joseph R. **HRADEL** and Harold E. Staadt, Appellants,

v.

George L. **GRIFFITH**, George A. Lyte and Franklin B. Wells, Appellees.

George L. **GRIFFITH**, George A. Lyte and Franklin B. Wells, Appellants,

v.

Joseph R. **HRADEL** and Harold E. Staadt, Appellees.

Patent Appeal Nos. 7671, 7676.

United States Court of Customs and Patent Appeals.

Nov. 17, 1966.

Rehearing Denied Feb. 9, 1967.

---

John A. Blair, Detroit, Mich., for appellants.

James W. Dent, Washington, D. C., (William D. Lucas, New York City, of counsel), for appellees.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and ALMOND, Judges.

RICH, Judge.

This appeal and cross-appeal are from a decision of the Board of Patent Interferences awarding priority to Griffith et al., senior party in interference No. 92,370 involving Griffith et al. (hereinafter Griffith or appellees) application serial No. 770,302, filed October 29, 1958, entitled "Ammonium Nitrate Explosive Mixture" and Hradel et al. (hereinafter Hradel or appellants) application serial No. 784,881, filed January 5, 1959, entitled "Ammonium Nitrate Explosive Composition." The single count adequately describes the invention:

> An explosive composition consisting essentially of particulate ammonium nitrate in admixture with a minor amount of particulate aluminum and 1 to 6 percent by weight water based on the total composition.

The sole issue is whether Hradel actually reduced the invention to practice before Griffith's filing date.

Appellants introduced evidence of tests made on their behalf in 1955 and 1956. In these tests, compositions, found below to conform to the count, were placed in the bottom of "post holes," about four feet deep and six inches in diameter, covered with earth, and detonated. Although the board found that the compositions conformed to the count, it held appellants' evidence otherwise failed to establish reduction to practice. Its reasons may be summarized as follows:

A. Appellants did not establish the production of a "pumpable explosive composition which may be easily and safely loaded into a bore hole or fissure in an earth formation." (Appellants' specification discloses the production of such a composition as *an* object of their invention.)

B. The Hradel application discloses utility in mining. The tests in question, carried out in "post holes" only four feet deep, did not demonstrate utility in mining.

C. Appellants' tests were regarded by them as indicative of no more than the "work potential" of the compositions, interpreted by the board as meaning the

mere possibility of fulfilling their intended purpose.

D. There was no evidence of a conviction of success on the part of appellants. (This reason seems to be a deduction from "C".)

Appellants argue that the board was led into error by a mistaken notion of the testing here required for a reduction to practice. They contend that their specification discloses the production of a *"pumpable"* explosive and the production of a *"pasty"* explosive as separate objects for compositions containing 12–25% water and 3–12% water, respectively, and that the board erred when it required a composition which is within the count to meet an objective applicable to a composition which is outside of the count. Appellants attach little importance to the lack of actual mining tests, urging that the existence of innumerable varieties of mining ensure the utility of an explosive having the capabilities demonstrated. They also argue that the board's inferences with regard to the inventors' own evaluation of the tests are unwarranted. They trace these misconceptions to the board's misconstruction of the term "work potential" in the specification. "Work potential" is defined by appellants as the presently existing "ability to actually move material as against fragmenting it." The board, according to appellants, "regarded it as denoting some unrealized or unconsummated purpose."

Appellees agree with the board in its reasons for rejecting the several alleged actual reductions to practice. Further, they argue that no utility was demonstrated for a variety of other reasons— the failures to detonate intermixed with successful detonations; the admitted unwillingness on the part of appellants to make "commercial sales" of the compositions on the basis of the tests; the discovery in the same tests of a composition regarded as more promising than those of the count; the supervision and objectives of the second series of tests, directed by a patent agent for purposes divorced from practical utility; and the recognized explosive nature of certain ammonium nitrate and water compositions. In their cross-appeal, appellees assert that appellants failed to prove that the compositions tested were made with *particulate* ammonium nitrate, as required by the count, that appellants lacked any conception of the invention at least until the Griffith filing date, and that appellants have improperly relied upon experiments with compositions which, though within the count, are outside the scope of appellants' disclosure.

The starting point for an analysis of the alleged reduction to practice in this case is stated in Blicke v. Treves, 241 F.2d 718, 720, 44 CCPA 753, 757 (1957):

> * * * the invention of such a composition is not complete unless its utility is either obvious or is established by proper tests, regardless of whether the claims contain any specific reference to utility.

When the count is to a composition and does not specify a particular use, evidence of utility for any purpose is sufficient. Rimbach v. Wanmaker, 362 F.2d 561, 53 CCPA —— (1966) and cases cited therein.

The principal issue in this case, then, is whether appellants' tests in 1955 and 1956 established or made obvious the utility of the composition for any purpose. Appellants do not contend that utility was sufficiently obvious to eliminate the need for tests. Nor, on the other hand, do appellees contend that there is any serious doubt of the capacity of the compositions tested to blow craters in the earth.

Since the demonstration of utility required for reduction to practice demands, at most, a showing of suitability for an asserted use, we will judge appellants' tests by the criteria of their specification. It states (emphasis ours):

> Accordingly it is an object of this invention to provide an ammonium

nitrate explosive mixture in the form of an acqueous [sic] composition which may be readily loaded as by pumping the composition into a borehole *or by first placing the composition, if pasty, in rigid or flexible containers and positioning the containers in a borehole,* the aqueous composition having substantially no voids therein and especially when in the form of a slurry the composition further filling any confining space in the manner of a liquid so as to generally eliminate voids below the surface of the slurry.

It is another object of the invention to provide an ammonium nitrate explosive composition which can be prepared from low cost materials.

It is another object of the invention to provide an ammonium nitrate explosive composition compounded from substances which do not produce toxic products when the composition is detonated.

It is a still further object of the invention to provide an ammonium nitrate explosive composition which is readily compounded at or near the site where it is used.

We will take the board's statement that appellants' alleged reductions to practice did not achieve the objects of the invention set forth in the specification to be bottomed on a supposed need for a test of the explosive in a "bore hole or fissure." The context of the board statement requiring "production of a pumpable explosive composition" suggests that the board did not attach especial importance to "pumpable." In any event, it seems clear to us that the specification of Hradel describes alternative objects for explosives with divers water contents and, at least in this respect, an actual reduction to practice might be accomplished with ei-

ther a pumpable or a pasty composition. The board appears not to have found any other failure to accomplish the listed objectives.

■ Appellees apparently also challenge the contention that a safe explosive was prepared from low cost materials, arguing that the explosive compounded was proven neither cheaper nor safer than prior art compounds. The fallacy in this reasoning is obvious. Superiority need not be shown. In re Ratti, 270 F.2d 810, 46 CCPA 976 (1959); Schmitz v. Silver, 103 F.2d 390, 26 CCPA 1164 (1939).

■ In our opinion, each flaw attributed by the board to appellants' reduction to practice proofs is rooted in the board's underlying evaluation of the work as insufficient for certain specific uses.[1] The board sought evidence of actual reduction to practice in a mine or a well. It found none. In our view, the board embarked on an unnecessary search. While appellants were no doubt in search of commercial explosives, it is, of course, not required that commercial use be established. Corona Cord Tire Co. v. Dovan Chemical Corp., 276 U.S. 358, 48 S.Ct. 380, 72 L.Ed. 610 (1928); Schnick v. Fenn, 277 F.2d 935, 47 CCPA 1174 (1960). While the board has not expressly required a demonstration of commercial use, it nevertheless emphasized failure to test in a well or in a mine. This approach is unwarranted when the invention is not limited in terms by the count to any particular use and the specification makes clear that other uses are contemplated.

■ The proper subject of inquiry in this case is whether appellants' alleged reductions to practice demonstrated utility of the pasty ammonium nitrate explosives within the count for any purpose. Whatever the minimum demonstration of the utility of an explosive composition

---

1. It is important to distinguish between the goals of the *project* being pursued when the alleged reductions to practice were made and the objects of the *invention* of the count. The former often embrace the production of superior commercial products. Reduction to practice *may* occur, however, *without attaining the* specific goals of the project.

may be, the instantaneous excavations[2] of Hradel seem to us amply sufficient. An inquiry into why or where someone might want the earth moved or, wanting it moved, would choose to do so with the means provided by appellants relates more to an analysis of the commercial salability of the invention than to its reduction to practice.

Most of the other considerations urged upon us by appellees as indicative of the fundamental correctness of the board's decision are disposed of by our view of the case as explained above.[3] Several, however, merit separate discussion.

Appellees urge that the first series of tests is "inconclusive" because in 4 of the 8 tests there was no explosion. They assert appellants have admitted as much. We do not believe that the 1955 test series is necessarily thereby rendered inconclusive on an invention of this kind, nor do appellants concede that such is the case. Appellants were seeking an *insensitive* explosive; their work naturally involved failures to detonate.[4] Furthermore, the second 1956 series of tests, on which appellants equally rely, was unchallenged on this score, all 15 tests resulting in explosions characterized as "very good," or "excellent."

Appellees' major point on cross-appeal is that the explosive compositions with which appellants' experiments were concerned was not proven to meet the requirement of the count that the compositions contain *particulate* ammonium nitrate. Appellees concede that the use of particulate ammonium nitrate might

be inferred from appellants' evidence of its presence at the site of the tests. Appellees urge, however, that their own evidence shows that *caked* (non-particulate) ammonium nitrate was also available and that, in the absence of direct evidence on the point, an inference favorable to appellants was unwarranted. We are unable to agree.

Appellees rely on the following testimony of the witness Brown with respect to the first series of tests:

> XQ93. It [the ammonium nitrate] could have had water in it? A. Not and pour out in granular form.
>
> XQ94. What happens when water gets on an ammonium nitrate bag? A. Partially sets or sets.
>
> XQ95. Cakes up? A. Yes.
>
> XQ96. Like clay? A. Yes.

They argue in their brief:

> The record shows that the witness Brown in giving this answer could only have been speaking from his experience with ammonium nitrate at Stratablast Acres [the site of the tests]. Prior to joining the Stratablast project, Brown worked as foreman for a Sapulpa Tank Company and had only a High School education * * *. Thus, the sole indication in the record is that whatever experience Brown acquired with ammonium nitrate occurred in his work at Stratablast Acres and therefore Brown's testimony as to ammonium

---

2. Charges placed in the "post holes" produced craters 10 to 12 feet in diameter and 2½ to 6 feet deep, thus moving a considerable amount of earth and demonstrating the "work potential" of the charges.

3. The board cited Seeley v. Rennick, 314 F.2d 577, 50 CCPA 1214 and Triplett v. Steinmayer, 129 F.2d 869, 29 CCPA 1243. We do not feel they are applicable in this case.

4. The following passage from appellants' brief will make this point clear:
   The principal objective of Griffith is to provide a highly sensitive explosive,

i.e., one which is capable of being detonated by a small blasting cap (R. 11). He achieves this objective by using small quantities of both water and aluminum in the ammonium nitrate.

The Hradel compositions, on the other hand, are not capable of being detonated by even the largest size blasting cap. They are detonated by a shaped charge of an explosive known as RDX, which in turn is fired by a blasting cap (R. 69–73). Hradel was interested in safety (R. 63), which means he desired an insensitive explosive.

nitrate in wet paper bags becoming caked was in fact directed to the ammonium nitrate at Stratablast Acres.

Appellees also point to the testimony of the witness Muir that the ammonium nitrate for the first series of tests was received in "multi-wall paper bags" and stored "Outdoors with a polyethylene tarp over it." Only from this do appellees presumably wish us to infer the availability of caked ammonium nitrate at the test sites.

They summarize their arguments on the first series of tests as follows (our emphasis):

> Griffith et al. have adduced evidence that the ammonium nitrate at Stratablast Acres *was caked*. The record merely establishes for Hradel et al. that particulate ammonium nitrate was at times available at Stratablast Acres. Since no witness could testify as to the specific form of the nitrate in the test compositions of Exhibits 4–7 and A–D, *the inference* that the ammonium nitrate in such tests was caked *is just as much plausible* as the inference relied upon by Hradel et al. that the nitrate was not caked. In the light of the rule that Hradel et al. have the burden of proof to establish the particulate nature of the ammonium nitrate, we submit that Hradel et al. have completely failed to sustain their burden because the record clearly *allows drawing equally valid inferences* that the ammonium nitrate was particulate or was not.

Only an unduly generous view of appellees' case would raise a substantial doubt as to the validity of appellants' evidence that all the ammonium nitrate at the test site was particulate. One would have to accept as fact appellees' suppositions, assume that it rained, and that the ammonium nitrate was covered by an ineffective "tarp" to shape the testimony into evidence even of the presence of caked material at the test site. We are unwilling so to do. We agree with the board that the "record as a whole establishes that the ammonium nitrate and aluminum employed in the tests in question were particulate."

Appellees urge that the ammonium nitrate of the second series was identified only as "M-23" and "ammonium nitrate," no comment on its form having been made. But "M-23" is elsewhere satisfactorily identified as *particulate* ammonium nitrate.

We find it unnecessary, as did the board, to treat appellees' objections to several of the tests as outside the scope of appellants' disclosure. Enough of the tests are concededly within the scope of the disclosure to obviate the need for any inquiry into the others.

The decision of the board is *reversed*.

### REVERSED

Judge MARTIN participated in the hearing of this case but died before a decision was reached.