59 CCPA

**John W. MYERS and William C. Lanning, Appellants,**

**v.**

**Stanford I. FEIGELMAN and Eugene Aristoff, Appellees.**

**Patent Appeal No. 8563.**

United States Court of Customs and Patent Appeals.

Feb. 24, 1972.

Worley, C. J., took no part in decision.

J. Arthur Young, D. J. Quigg, L. Malcolm Oberlin, Bartlesville, Okl., attys. of record, for appellants; Paul L. Gomory, Washington, D. C., of counsel.

Virgil E. Woodcock, John J. Mackiewicz, Woodcock, Washburn, Kurtz & Mackiewicz, Philadelphia, Pa., attys. of record, for appellees; Robert R. Cochran, Philadelphia, Pa., of counsel.

Before WORLEY, Chief Judge, and RICH, ALMOND, BALDWIN, and LANE, Judges.

RICH, Judge.

This appeal is from the decision of the Board of Patent Interferences awarding priority to Feigelman et al., senior party,[1] who stood on their March 10, 1961, filing date, on the ground that Myers et al., junior party,[2] have not established conception and reduction to practice prior to that date. We reverse and remand.

*The Contested Subject Matter*

The count is directed to an improvement in a thermal, noncatalytic process for hydrodealkylating alkylated monocyclic aromatic hydrocarbons (e. g., toluene) which consists of "introducing diphenyl into the reaction zone" in a specified concentration along with the subject alkylated hydrocarbons. Actually, the point of the invention seems to be that diphenyl is present in a residue from the principal reaction which can be recycled, having the effect of giving a higher yield of recoverable, dealkylated, monocyclic aromatic hydrocarbons (e. g., benzene) than is otherwise obtainable. The count reads as follows (subparagraphing and emphasis supplied):

1. In a process for hydrodealkylating alkylated monocyclic aromatic hydrocarbons in an alkylated monocyclic aromatic-containing hydrocarbon fraction wherein

such fraction is subjected to thermal conversion

in a reaction zone devoid of catalytically active material

in the presence of hydrogen

at a temperature ranging from 950°F. to 1450°F.

at a pressure ranging from 400 pounds per square inch to 10,000 pounds per square inch

for a time ranging from 1 second to 600 seconds

with the amount of hydrogen ranging from 1.0 to 20.0 moles of hydrogen per mole of the normally liquid hydrocarbon charge, *the improvement which comprises*

increasing the yield of recoverable *monocyclic aromatic hydrocarbons by*

*introducing diphenyl into the reaction zone* together with the alkylated monocyclic aromatic-containing hydrocarbon fraction,

1. Feigelman and Aristoff, involved on their patent No. 3,160,671, issued December 8, 1964, on an application filed March 10, 1961.

2. Myers and Lanning, involved on their application No. 512,100, filed December 7, 1965, as a continuation-in-part of application No. 121,016, filed June 30, 1961.

said diphenyl being *in an amount ranging from 1 mole percent to 15 mole percent* based on the total moles of normally liquid hydrocarbon charge to the reaction zone, and

recovering the monocyclic aromatic hydrocarbons.

### The Board's Opinion

The board first held that,

Since the Myers et al. application was filed after the issue date of the Feigelman et al. patent, junior party Myers et al. has the burden of proving priority of invention beyond a reasonable doubt.

Second, the board held that

* * * Myers and Lanning have not established conception and reduction to practice of the invention of the count prior to the filing date of the senior party by the required degree of proof.

The board opinion indicates that it came to the latter conclusion (1) because there was no corroboration of the inventors' testimony that they knew before they instructed a subordinate (Drehman) to conduct the experiment on which they rely that the "heavy ends" which he was instructed to add to an otherwise old hydrodealkylation process contained diphenyl, and (2) because appellants' evidence did not establish with the requisite degree of certainty (a) the composition of those "heavy ends," (b) the circumstances of whatever analyses were made of them, or (c) the composition of the hydrocarbon mixture which, along with the "heavy ends," was the subject of the run.

### The Issues

There are two issues before us. First, did the board err in holding that the junior party had the burden of proving priority beyond a reasonable doubt? Second, under whatever burden of proof applies,[3] did Myers et al. establish conception and reduction to practice of the claimed subject matter prior to Feigelman et al.'s filing date?

## THE PARTIES' ARGUMENTS

### I. As to Burden of Proof

Myers et al. argue that their burden is to prove priority by a preponderance of the evidence because their application involved here is a continuation-in-part of an application which was copending with the application which matured into the senior party's patent and that their parent application supports the count. Feigelman et al. respond that the board imposed the correct burden on the junior party because the parent application was not specified in the notice of interference[4] in the manner specified by Rule 207(b)[5] and the junior party did not

---

3. See Sloan v. Peterson, 129 F.2d 330, 331–332, 29 CCPA 1055, 1056 (1942).

4. In the declaration of interference after the printed words "Accorded benefit of" in the section dealing with appellants' application, the copy of the notice in our record at page 355 has the words "Ser. No. 121,016 filed June 30, 1961" and, adjacent thereto, the entry "Denied by (see #24)," all written by hand. Apparently the first entry was made at the time of the examiner's ruling on appellees' petition to dissolve the interference (see the next paragraph of text), not when the notice was originally sent to the parties, and the second at the time of the Commissioner's overruling of the examiner's decision insofar as he had accorded appellants the benefit of the filing date of their parent application.

5. Rule 207(b) reads, so far as is relevant here:

> If the application or patent of a party included in the interference is a division, continuation or continuation-in-part of a prior application and the examiner has determined that it is entitled to the filing date of such prior application, the notices shall so state.

Rule 207(a), to which the above sentence implicitly refers, is as follows:

> (a) When an interference is found to exist and the applications are in condition therefor, the primary examiner shall forward the files to the Board of Patent Interferences together with a statement indicating the claims of each applicant or patentee which are to form the respective counts of the interference and also indicating whether any party is entitled to the benefit of the filing date

move under Rule 231(a) (4)[6] to be accorded the benefit of the filing date of their parent application.[7]

In this connection, Myers et al., point to a decision of the primary examiner, on a motion to dissolve under Rule 231(a) (1) on the ground the count was unpatentable over prior art, made by Feigelman et al., holding that the Myers et al. parent application does support the count. In response, Feigelman et al. concede that the primary examiner held that appellants' parent application supports the count but point out that on a petition under Rules 244(d) and 181, the First Assistant Commissioner expressly overruled the examiner insofar as he had accorded Myers et al. the benefit of the filing date of their parent application *for priority purposes*, stating that "Myers et al., even in their opposition to the motion to dissolve [which was filed after the end of the motions period], did not request such benefit except as a ground for denying the motion" and that, "if the opposition to the motion to dissolve can be considered as a motion to obtain the benefit of the earlier application it should have been dismissed as having been brought late without excuse and without the service of application papers as required by Rule 224." Myers et al. sought no review of this decision, and Feigelman et al. now argue that the unavailability of the parent's date for priority purposes is "the law of the case."

Finally, appellees argue that the examiner was wrong, that appellants' parent application really does not support the count. In turn, appellants argue in a reply brief that the *examiner's* holding [8] that their parent application supports the count is "the law of the case," and that therefore the question may not be reopened, but that, in any event, it was correct.

## II. As to Reduction to Practice

Appellants Myers et al. argue that, since the "heavy ends" used in the run on which they rely as an actual reduction to practice in fact contained diphenyl, it is immaterial whether they *knew* that *before* the run started. They say all that is important is that they *knew* it before the senior party's filing date, and that their evidence establishes that they did. They also argue that this court can take judicial notice that it was well known prior to the date relevant here that such "heavy ends" contain diphenyl.

Concerning the sufficiency of their proof with respect to the run itself, appellants argue that their evidence does establish that all parameters were within the limitations of the count and that minor uncertainties concerning just what those parameters were are unimportant.

of any prior application as to the subject matter in issue, and, if so, identifying such application.

6. Rule 231(a) (4), as it then read, was as follows:

> 231. Motions before the primary examiner. (a) Within the period set in the notice of interference for filing motions any party to an interference may file a motion seeking:
>
> *   *   *   *   *
>
> (4) To shift the burden of proof, or to be accorded the benefit of an earlier application which would not change the order of the parties.

7. Rule 224, so far as is relevant here, states that:

> A party will not be permitted to rely on any prior application to obtain the benefit of its filing date unless the prior

application is specified in the notice of interference * * * or its benefit is sought by motion filed in accordance with rule 231.

8. Actually, appellants argue that the First Assistant Commissioner affirmed the primary examiner as to the sufficiency of the support for the count in appellants' parent application and that appellees "seek to have this Court reverse the Examiner's and Commissioner's decision on this point." That is not so. Appellees did not seek review of the examiner's holding as to sufficiency of support, nor would the Commissioner's decision have been binding in this proceeding if they had done so, In re Stauber, 45 F.2d 661, 663, 18 CCPA 774, 777 (1930), and in fact the First Assistant Commissioner did not even intimate approval of the examiner's holding on that issue.

Appellees Feigelman et al. Focus on those inconsistencies and the general vagueness of appellants' evidence concerning the manner in which the analyses of the inputs and the output of the run were made. Further, they argue that appellants have not proved that the run on which they rely was within the limitations of the count because some of the important testimony concerning it was "pure hearsay." Concerning this last point, appellants argue that the testimony attacked as hearsay was that of an expert chemist, giving his calculations based on the testimony of workers who had made routine gauge readings during the run, and that "recognition of realities of technical operations in modern day laboratories" does not require the presence of the professional during such operations. Appellees further argue that appellants suppressed or concealed the invention, assuming that they did make it and that it was disclosed in their parent application, because they did not *claim* it for some five years after they assert they made it.

## OPINION

### I. *As to Burden of Proof*

██ The sentence from the board's opinion which we quoted above is all the board said about the imposition on the junior party of the beyond-a-reasonable-doubt burden, and it is not possible to tell from that sentence whether the board thought itself bound by the Commissioner's decision on the petition discussed above, or whether it simply agreed with it. The question of the burden of proof on a junior party in an interference is not ancillary to priority as that phrase is strictly defined by Rivise and Caesar in § 251 of Interference Law and Practice, because it is not "a question which, if decided in favor

of the party raising the question, would necessarily result in a judgment against his opponent," [9] but it is a question which is "logically related" to the basic, jurisdiction-giving question of priority because it should be decided, logically, before either the board or this court can pass on the sufficiency of the junior party's proofs. See Palisades Pageants, Inc. v. Miss America Pageant, 442 F.2d 1385, 1387–1388, 58 CCPA 1225, ——, (1971), cert. denied 404 U.S. 938, 92 S.Ct. 269, 30 L.Ed.2d 251, (1971). This court has previously implicitly held that it is a question which is appealable rather than petitionable. Sloan v. Peterson, supra note 3. Accordingly, it is an issue which should have been considered independently by the board.

However, while we do not regard the Commissioner's decision as binding on either the board or this court, we do adopt the following portions of First Assistant Commissioner Reynolds' opinion as our own because we agree with the reasoning by which he arrived at his decision (emphasis ours):

> The Examiner denied the motion to dissolve and held the benefit of the earlier case should be accorded to Myers et al. In so holding he stated that the original failure to accord Myers et al. this date was inadvertent and that "the facts regarding said prior application were timely set forth in the October 10, 1966 Opposition to Motion to Dissolve."
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> &ast; &ast; &ast; so far as the Examiner's action appears to accord Myers et al. the benefit of the earlier application *for priority purposes*, it is not thought to have been proper. That action was gratuitous in that Myers et al., even in their opposition to the motion to dissolve, did not request such benefit

---

9. We note that on the very next page Rivise and Caesar indicate that "the questions raised by motion to shift the burden of proof are necessarily ancillary," op. cit. supra at 1010, although resolution of this issue, like resolution of the issue before us, is clearly not necessarily dispositive of the issue of priority. We take it that by the above-quoted language Rivise and Caesar simply meant that the issue is appealable, as is the case with the closely related issue of the proper burden of proof to impose.

except as a ground for denying the motion and it was not necessary for the Examiner to go further than to decide the motion actually before him.

However, if the opposition to the motion to dissolve can be considered as a motion to obtain the benefit of the earlier application *it should have been dismissed as having been brought late without excuse and without the service of application papers as required by Rule 224.* The Examiner's statement that the failure to accord the benefit of the earlier case in declaring the interference was inadvertent does not alter the situation and does not excuse the failure of Myers et al. to file a timely motion. Almost every case in which a party is accorded the benefit of an earlier case not mentioned in the declaration of the interference might be said to involve an inadvertence.

It is urged by Myers et al. that the grounds on which the present petition is based are procedural and technical and that Feigelman et al. have not been prejudiced by the procedure followed by the Examiner. However, the rules are designed to provide an orderly procedure and the parties are entitled to rely on their being followed in the absence of such circumstances as might justify waiving them under Rule 183. To hold that they may be ignored, in the absence of such circumstances, merely because no special damage has been shown would defeat the purpose of the rules and substantially confuse interference practice.

Thus, we do not reach the question of whether the junior party's parent application supported the count, at least so far as the burden-of-proof issue is concerned. Since it was not specified

in the notice of interference, the only way that Myers et al. could obtain the benefit of its filing date was by way of a motion under Rule 231(a) (4). They made no such motion, and their only excuse for not having done so [10] is no excuse at all. We therefore conclude that under the circumstances the board imposed the correct burden of proof on the junior party.

## II. As to Conception and Reduction to Practice

As stated in Rivise and Caesar, III Interference Law and Practice § 461 (1947),

> The required degree of proof is an exceedingly important factor in determining the question of priority of invention, and many decisions have turned on the point as to whether the burden on the junior party was to prove his case by evidence beyond a reasonable doubt or merely by a preponderance of the evidence.

Turning to the specifics of this case, the board rested heavily on its finding of lack of corroboration of appellants' personal testimony that they knew *before* they instructed Drehman to set up the run on which appellants rely for reduction to practice that the "heavy ends" which they instructed him to add to "Rice Plant Heavy Platformate" [11] in a laboratory hydrodealkylation process contained diphenyl. Appellants argue the irrelevance of this lack of corroboration on two grounds.

First, they assert that "it was known as early as 1956 that the high boiling heavy ends fraction produced in dealkylation of hydrocarbons consists 'chiefly of diphenyl'," citing an article from the Journal of Applied Chemistry which they

10. Myers et al. argue in their brief: Counsel for Myers did not refer to the 1961 application because the Feigelman patent had already issued on December 8, 1964 (R163) when Myers provoked this interference. It was known that its filing date, March 10, 1961, was about three months earlier than the June 30, 1961 filing date of Myers' application, Serial No. 121,016. Hence, Myers could

not avail himself of this earlier application for priority purposes, i. e., as basis for a motion to shift the burden of proof.

11. According to the record, the Rice plant is a natural gas processing plant in Borger, Texas, and Platformate is the trade name for a fractionation product of that plant containing primarily toluene.

urge we can use as a basis for taking judicial notice of that fact. This is not the kind of thing which we will use as a basis for taking judicial notice. In any event, the question here is not the general one of what was a part of the prior art as of March 10, 1961, but the specific one of whether prior to that date these appellants in particular have proved that they had conceived the invention, which involves the use in the process of the count of a concentration of diphenyl lying within a certain range. Thus we disagree with appellants' first contention but agree with their second, which is that it is irrelevant whether they knew *before they ordered the run* that the "heavy ends" used contained a concentration of diphenyl bringing the overall concentration of diphenyl within the range specified in the count, so long as they knew that *before appellees' filing date*. Since it is undisputed that internal correspondence of appellants' assignee dated before the critical date, the authenticity and date of which have not been challenged, indicate that appellants had caused an experiment to be performed which they *thought* had parameters which were within the count, the dispute here becomes one over the adequacy of appellants' proof concerning the composition of the feed actually used in the single run on which they rely.

Drehman, the chemist who actually set up the experiment under appellants' general direction, testified that the feed was to consist of 88% by weight "Rice Plant Heavy Platformate" and 12% by weight "heavy ends produced in previous runs obtained by distilling products to 160°C." Appellees have not questioned that the feed did consist of those two components in essentially those proportions,[12] but they have questioned the ade-

quacy of appellants' proof concerning the composition of each component.

In the first place, there is some conflict in the record concerning the composition of the "Rice Plant Heavy Platformate" component of the feed. According to Drehman's report previously referred to, the feed contained 73.62% by weight toluene, which figure he testified was based on a gas chromatographic analysis which he had previously made and the results of which are in the record. However, the previous gas chromatographic analysis had indicated that the Rice Plant Platformate contained 81.67% toluene, so a feed consisting of 88% Rice Plant Platformate would contain only 71.87% toluene, assuming no toluene input from the other component. The board used this difference as the apparent basis for its statement that "The 'Rice Plant Heavy Platformate' said to be employed by Drehman [in the run relied upon for reduction to practice] has not been identified with reasonable certainty." While the difference does suggest some uncertainty concerning the exact percentage of toluene in the feed, the count is very broad in this respect, reciting only that a nondiphenyl component of the feed be "an alkylated monocyclic aromatic-containing hydrocarbon fraction," and, despite the minor inconsistency concerning toluene noted by the board, we have no reasonable doubt that appellants' run did have such a fraction as a component of its feed.

Similarly, Drehman testified that he had analyzed the "heavy ends" which were to be used in the run and that the components making up the 12% by weight "heavy ends" consisted of 7.12% by weight (of the total feed) diphenyl, 0.18% by weight naphthalene, and 4.70%

12. They have, as previously noted, challenged Drehman's entire testimony concerning what took place during the run on the ground that he was not present and that his testimony is therefore "pure hearsay." However, no such objection was made to the evidence when it was offered, and appellees have therefore waived

any objection to it which they might have had. Diaz v. United States, 223 U.S. 442, 450, 32 S.Ct. 250, 56 L.Ed. 500 (1912), New England Fish Co. v. United States, 15 Ct.Cust.App. 34, 38, T.D. 42137 (1927), McCormick on Evidence, § 52 (1954), and 1 Wigmore on Evidence, § 18 (3rd ed. 1940).

by weight "Heavies," which were not further identified, and that, "Since the molecular weight of diphenyl is about 60 or 70 per cent greater than the molecular weight of the feed, the mole per cent would then be 7.1, divided by approximately 1.6." Doing the arithmetic, we get a mole percent diphenyl of between about 4.2 and 4.4, which is within the count's recitation of "an amount ranging from 1 mole percent to 15 mole percent based on the total moles of normally liquid hydrocarbon charge to the reaction zone." However, the contemporaneous monthly reports prepared by Drehman and by Myers, one of the inventors, are not in agreement as to the source of the "heavy ends" used,[13] a circumstance which appellants have not explained and which appellees argue casts doubt on Drehman's flat assertion that he had performed a gas chromatographic analysis on *the* "heavy ends" used in the run which resulted in the quoted figures.[14]

Notwithstanding the doubt on the point just mentioned, the evidence is clear and uncontroverted that the Myers report was merely a summary of the Drehman report, as well as of other contemporaneous research. Under the circumstances, the most logical explanation for the discrepancy is that Myers simply made a mistake in summarizing Drehman's report. Furthermore, whatever the reason for the discrepancy, the only question is whether the feed used in appellants' run contained an amount of diphenyl which is within the 1 to 15 mole percent range specified in the count. Drehman testified that the feed contained between 7 and 7.2 weight percent diphenyl. Since the feed was 12 weight percent heavy ends and all the diphenyl presumably came from the heavy ends, that would mean that the heavy ends were between 58 and 60 weight percent diphenyl. The Myers report states that "Chromatography analyses indicate" that the products of the preliminary, heavy-ends-producing tests were "about 60 per cent diphenyl." Though we cannot be sure that the particular heavy ends used in the run on which appellants rely contained between 58 and 60 weight percent diphenyl, if the heavy ends used contained anywhere from about 13 to 100 weight percent diphenyl, the run was within the count.[15] On this record, we have no reasonable doubt that the heavy ends appellants used did contain at least 13 weight percent diphenyl, and we therefore *reverse* the board's holding that Myers et al. did not establish beyond a reasonable doubt both conception

13. The "detailed [monthly] progress report" prepared by Drehman identifies the "heavy ends" as "kettle bottoms from distillations of products produced in previous work at conditions varying from 1260–1400F. with conversions ranging from 75–95%." On the other hand, the "somewhat abbreviated [monthly] summary progress report" prepared by Myers identifies the "heavy ends" as the portion boiling above 350°F. of the liquid products of certain tests, which tests were conducted at temperatures varying from 1333°–1399°F. with conversions ranging from 85.2–95.9%.

14. The results of this asserted gas chromatographic analysis appear in two different exhibits as follows:

|  | Ex. 1 | Ex. 4 |
|---|---|---|
| Diphenyl | 7.09 | 7.12 |
| Napthalene | .20 | .18 |
| Heavies | 4.70 | 4.70 |

When asked to explain these "slight differences," Drehman stated that he could not do so. However, he stated that he was certain that the true figure for the diphenyl content lay between 7.0 and 7.2 and that the true figure for the napthalene content lay between 0.1 and 0.3, and appellants argue that these "insignificant discrepancies" do not suggest that the diphenyl content was outside the parameter of the count. We agree, as apparently the board did also, for it did not mention this particular discrepancy.

15. The count calls for from 1 to 15 mole percent diphenyl in the feed. The mole percentage of diphenyl in the feed is equal to the weight percentage diphenyl in the heavies times the weight percentage heavies in the feed divided by approximately 1.6. If the heavies were 100 percent diphenyl, the mole percentage of diphenyl in the feed would be about 7.5, which is less than the count maximum. If the mole percentage of diphenyl in the feed was one, the count minimum, the weight percentage diphenyl in the heavies would be about 13.3.

and reduction to practice of subject matter within the count prior to the filing date of Feigelman et al.

### III. *As to Suppression and Concealment*

■■ Because of its determination with respect to appellants' reduction to practice, the board did not reach appellees' contention that appellants had forfeited whatever right they may once have had to obtain a patent on the subject matter of the count. While this issue is ultimately one of law, Brokaw v. Vogel, 429 F.2d 476, 480, 57 CCPA 1296, 1301–1302 (1970), it is one which "must be considered and decided on its own facts." Englehardt v. Judd, 369 F.2d 408, 411, 54 CCPA 865, 870 (1966). Here we have not had the benefit of the board's views on the suppression and concealment issue. While we undoubtedly have the *power* to proceed on our own and decide questions not reached by the board which become relevant only because we have reversed the board on questions which they did reach, Sloan v. Peterson, supra, 129 F.2d at 333, 29 CCPA at 1058,[16] in this case we *remand* to allow the board to make a fully focused inquiry into this difficult question.

In so doing, however, we point out an obvious difference between this case and Brokaw v. Vogel, supra, on which appellees rely. Vogel did not file his application until more than five years after his actual reduction to practice. Here appellants contend that subject matter within the claims was *disclosed* in their application filed within approximately seven months of the reduction to practice; if so, the question is whether they forfeited their right to a patent on that subject matter by not *claiming* it for some five years.

### IV. *Taxation of Costs*

■ Appellants ask that the cost of printing a 106-page addition to the rec-

ord, included at appellees' request, be taxed to appellees. Appellants argue in their reply brief that appellees should pay because appellees failed to expressly oppose the request in their brief. We do not agree. Although appellees did not expressly and formally oppose the taxation of this cost against them, they pointed out how they thought the addition to the record was "germane to the issue of priority," and we take this as the equivalent of an argument that appellants should have included the addition, at appellants' expense.

■ However, we do agree with appellants that their request should be granted because the addition to the record was not necessary for the purposes of *their* appeal. In this court appellees in interferences have the right to reargue issues which they raised below but on which either they lost or the board did not rely, cf. Kratz v. Calvert, 129 F.2d 542, 29 CCPA 1097 (1942), and Fageol v. Midboe, 56 F.2d 867, 19 CCPA 1117 (1932), particularly the concurring opinion by Judge Lenroot in the latter, but it is only fair that they should pay for the printing of any portion of the record required for that reargument but not necessary for the resolution of the issues raised in appellants' appeal. Here, the addition was "germane" only to arguments which appellees made below but on which the board did not rely—namely, that appellants had forfeited whatever right they may once have had to obtain a patent on the subject matter of the count and that the *file history* of appellants' parent application indicates that the application as filed did not support the count. Only appellees stood to benefit from the possibility that those issues would ultimately be reached, and appellees should accordingly pay for the addition to the record. It is so *ordered*.

### SUMMARY

For the foregoing reasons, the decision of the board is *reversed* and the case

---

16. In Sloan v. Peterson, we considered appellant's proofs against the preponderance-of-the-evidence standard although the board had considered them only against the beyond-a-reasonable-doubt standard.

*remanded* for further proceedings not in-consistent with this opinion.

Reversed and remanded.

WORLEY, C. J., took no part in the decision of this case.

59 CCPA