59 CCPA

**Leonide P. KOVAL, Appellant,**

v.

**August BODENSCHATZ, Appellee.**

**Patent Appeal No. 8688.**

United States Court of Customs and Patent Appeals.

Aug. 3, 1972.

---

Frank L. Neuhauser, Washington, D. C., attorney of record, for appellant. Robert T. Casey, Plainville, Conn., Philip L. Schlamp, Contractor Equipment Business Div., General Electric Co., Bridgeport, Conn., of counsel.

Sidney G. Faber, New York City, attorney of record, for appellant. Bernard Gerb, Jerome M. Berliner, Marvin C. Soffen, Marc S. Gross, New York City, of counsel.

Before RICH, Acting Chief Judge, ALMOND, BALDWIN and LANE, Judges, and MALETZ, Judge, United States Customs Court, sitting by designation.

LANE, Judge.

This appeal is from the decision of the Board of Patent Interferences awarding the senior party Bodenschatz priority of invention as to five counts copied from his patent [1] issued March 31, 1964, on an application [2] filed July 18, 1960. Appellant is involved on his application [3] filed May 18, 1962. Appellee took no testimony and relied on his 1960 filing date. Appellant sought to prove conception and actual reduction to practice prior to that filing date. The board found the evidence insufficient. We agree with the board that appellant's tests failed to establish an actual reduction to practice, and we affirm the board's decision.

### THE SUBJECT MATTER

The subject matter involved in this appeal is an electric circuit breaker, appellant's version of which is shown in side elevational view in Fig. 2 of his application reproduced below.

FIG.2.

KOVAL     S.N. 195,739

[A6127]

1. Patent No. 3,127,488.
2. Serial No. 43,680.
3. Serial No. 195,739.

The circuit breaker, shown in closed position, includes a base 10 and a cover 11 forming an insulated enclosure. Electric current passes through the breaker from an incoming connector 12 through incoming line terminal 13, upright conducting member 14, conductive extension 15, flexible conductor 16, first movable contact arm 17, first semi-stationary contact 18, first movable contact 19, carrier 20 for the movable contacts, movable contact 21, second semi-stationary contact 22, second movable contact arm 23, flexible conductor 24, conductive extension 25, an upright conductive member (unnumbered) on outgoing terminal strap 27, and strap 27 to load terminal 28. Contact carrier 20 is spring-biased upwardly to open position, but, when closed, is held in the position shown in Fig. 2 through cooperation between a pivotable latch 62 and a pin 69. Predetermined sustained overload current conditions cause thermal operation of the breaker due to the abnormal current heating a bimetallic element 82 to cause the element to operate through means including a trip rod 67 to release the latch 62 and thereby permit movement of carrier 20 to its upper or open position. Occurrence of higher current conditions, such as a short circuit, causes magnetic opening means, including an armature 86, to act more rapidly through the trip rod 67 to move carrier 20 to open position.

A distinctive feature of the breaker is the provision of semi-stationary contacts 18 and 22. These are termed "semi-stationary" because they remain in the position shown in Fig. 2 during lighter overload conditions, but are movable downwardly to separate from movable contacts 19 and 21 upon the occurrence of "extremely high short-circuit current conditions." In that case, the high currents through the breaker act electromagnetically through armatures rigidly attached to movable contact arms 17 and 23 to move those arms and contacts 18 and 22 downward. Latch members 59 and 49, respectively, then latch the arms 17 and 23 in open position. The total mass of the arms 17 and 23 and the other structure associated with the semi-stationary contacts is relatively small, permitting the opening of those contacts to take place so rapidly that the impendance of the electric arcs caused by the contacts' movement from the movable contacts is inserted in the circuit within 2 micro-seconds of the occurrence of the short circuit and before the movable contacts are tripped. This rapid opening of the semi-stationary contacts is described as producing a "current-limiting" action. "Current-limiting" is defined in appellant's specification as meaning that "the electric current is not permitted to rise to levels to which it would otherwise [sic] rise if the only impedance elements in the circuit were the source impedance and the normal impedance of the circuit breaker itself."

The circuit breaker is also provided with an operating handle 34 and attendant mechanisms. The handle permits opening of the circuit breaker by tripping it manually to open the movable contacts 19 and 21. The handle is also operable to reclose the circuit breaker, first moving carrier 20 for the movable contacts down to latched position and then causing release of the latches for the semi-stationary contacts 18 and 23 to permit those contacts to rise to closed position in engagement with the respective movable contacts.

Count 2 is representative of the counts on appeal and, with paragraphing ours, reads as follows:

2. A current limiting circuit breaker;

said current limiting circuit breaker comprising a movable contact and a semi-stationary contact;

first means for moving said semi-stationary contact between an engaging position and a disengaging position;

second means for moving said movable contact between an engaged and disengaged position with respect to said semi-stationary contact when said

semi-stationary contact is in its said engaging position;

said first means including fault responsive operating means for said semi-stationary contact;

said second means including additional fault responsive operating means for automatically operating said movable contact from said engaged to said disengaged position upon the occurrence of predetermined overload conditions;

said fault responsive means operatively associated with said semi-stationary contact to move said semi-stationary contact from its said engaging position to its said disengaging position responsive to fault currents through said circuit breaker of a predetermined nature;

said fault responsive operating means operable to move said semi-stationary contact to its said disengaging position while said movable contact is in its said engaged position;

said first mentioned fault responsive operating means including a magnetic blow-off path actuated by the current flow through said current limiting circuit breaker and calibrating means for restraining movement of said semi-stationary contact until the occurrence of a predetermined blow-off force.

Counts 1 and 3–5 also require only a single movable contact and a single semi-stationary contact and differ from count 2 in matters of breadth not material to this opinion.

### THE EVIDENCE

It appears from the record that Koval was hired by General Electric Company on March 1, 1957, as a circuit breaker engineer. He immediately began work on a current-limiting circuit breaker which became known in the General Electric circuit breaker engineering group as the Ultra-Rapid breaker. Koval completed assembly drawings and a written description of the breaker in 1957. Tests on which appellant relies for reduction to practice were conducted in 1957–1959. A final test made on March 16, 1959, at an outside facility in Philadelphia resulted in destruction of the breaker. No tests were made thereafter, and the breaker was never put into production. Although a Patent Evaluation Committee at General Electric considered filing a patent application on the invention several times during the two and one-half year period of testing, the committee did not authorize filing until January of 1960 and did so then only on a low priority basis. The actual filing was further delayed until May of 1962.

The evidence of record is less than fully explanatory of either the particular structure employed or the parts thereof involved in the tests. The witnesses, including Koval, who generally requested the tests, a laboratory technician, who performed most of the testing, the engineer in charge of the test laboratory, and other engineers associated with the circuit breaker work, were largely unable to add much detail to the reports of the tests placed in evidence either because their memories had faded by the time testimony was taken or because their original knowledge was limited by failure to observe the tests or inspect the apparatus being tested. The most precise information available on the tests seems to be directed to the voltages and currents involved and the number of "shots," or individual operations, performed.

Koval Exhibits 17, 18, 21, 22, 23, 24, and 25 are reports of the tests, and with respect to them, the board stated:

7. Tests reported in Koval Exhibits 17 and 18 were at low voltage (less than 12 volts) and did not test the interrupting capacity under normal operating conditions * * *.

8. The test reported in Koval Exhibit 21 was also conducted at low voltage (8 volts) and therefore did not test the interrupting capacity under normal operating conditions.

9. Koval Exhibit 22 reports a test conducted October 14, 1958. * * * Two short circuit tests at 240 volts, 5000 amperes were conducted and referred to as "shots." On the first shot one contact latched and the other did not. The device tested had two sets of contacts. On the second shot both contacts (presumably the semistationary contacts) opened and latched. The slow tripping mechanism did not operate in either case. The report notes that the device was returned to Koval for modifications. It is clear that this was not regarded as a successful operation of the device as a whole. We find nothing in the record to establish that even completely successful operation at the noted current and voltage would have been accepted as demonstrating that the device would operate as desired in its intended functional setting.

10. The test reported in Koval Exhibit 23 was apparently a rerun of the test of Exhibit 22 at 240 volts and 5,000 amperes. No malfunctioning is reported. * * *

11. Koval Exhibit 24 reports a test on December 16, 1958 which comprised two shots at 277 volts and two at 595 volts, all at 10,000 amperes. * * * [T]he only witness who observed the test * * * stated * * * that indications were that the test was successful. No malfunction was noted in the report.

12. Koval Exhibit 25 is a report * * * of tests made on various breakers on a trip to Philadelphia February 16–19, 1959 where test facilities for much higher currents were available. Page 3 gives the results of two shots on the Ultra Rapid breaker at 610 volts and 29,400 amperes. * * [The] [n]otes * * * indicate various mechanical failures, including failure of contacts to make upon reclosure of the breaker and that the mechanism was binding so as to be difficult to close and that the trip button would not trip the breaker. Apparently some work was done to free the mechanism and the second shot was made. * * [The] [n]otes * * * indicate that the mechanical condition was so poor that it was decided not to conduct further tests at that time.

## THE BOARD'S CONCLUSIONS

The board focused on the voltage and current conditions in finding the tests not to show actual reduction to practice. It found substantial evidence that the objective of the Ultra-Rapid breaker project was to provide a breaker suitable for 600 volt, 800 ampere installations with the ability to successfully interrupt very high circuit currents on the order of 25,000 to 50,000 or more amperes. The board concluded that none of the tests simulated these conditions and that they could not, therefore, be regarded as establishing a reduction to practice. However, the board also found that there was a lack of conviction of success and that there were other deficiencies in the testing, particularly the fact that reclosure was not demonstrated. As the board said in its decision on reconsideration, "reclosure is a necessary part of a reduction to practice of a circuit breaker."

Appellee presses the latter argument upon this court and urges that:

[A] circuit breaker is a device for automatically interrupting the current flow in the event of an abnormal condition, and for *reestablishing* the current flow—that is, the device must be reusable * * *. Thus, * * * Koval's purported reduction to practice must * * * demonstrate utility as a "circuit breaker" and not merely as a manually or automatically operable switch, or as a fuse capable of only a single interruption.

* * * * * *

From the Record it is clear that Koval's device was not subjected to many basic tests that must be performed before it can properly be said that the device was useful as a circuit breaker. That is, * * * Koval's

device was not subjected to even one closing on a faulted circuit * * * and the Record does not show that the device was even closed on a current carrying circuit. The device was not subjected to a multiple operations test or a continuous current test.

## OPINION

Appellant contends that the sole issue on appeal is "whether the [board] erred in holding in effect that an otherwise sufficient reduction to practice by the Appellant Koval is rendered ineffective because the magnitude of fault current used in his reduction to practice was not as high as that which he originally set up as his objective * * *." As noted above, the board found the testing insufficient for other reasons as well, and appellee properly criticizes appellant's characterization of the issues on appeal.[4] If appellant seeks to attack the board's decision on the narrow ground stated, the decision might well be summarily affirmed in view of the additional grounds stated by the board for its award of priority to appellee. However, we will reach the merits of the board's positions.

▮▮▮ We agree with appellant that requirements derived from the objectives of one of the parties that are not reflected in limitations embodied in the counts ordinarily cannot be imposed on an asserted actual reduction to practice. It is not necessary for testing to have proceeded to the point where the device is ready for commercialization in order to have an actual reduction to practice. See Goodrich v. Harmsen, 442 F.2d 377, 383, 58 CCPA 1144, 1153 (1971); Hradel v. Griffith, 367 F.2d 851, 54 CCPA 911 (1966). However, there must be a relationship between the test conditions and the intended functional setting, Paivinen v. Sands, 339 F.2d 217, 226–227, 52 CCPA 906, 918 (1964), and the

tests must prove that the invention will perform satisfactorily in the intended functional setting. Knowles v. Tibbets, 347 F.2d 591, 594, 52 CCPA 1800, 1804 (1965); Voisinet v. Coglianese, 455 F.2d 1064, 1068, 59 CCPA (1972). Thus, while we would agree with appellant that the board erred to the extent that it imposed specific voltage or current interruption requirements on the basis of the ultimate commercial Ultra-Rapid breaker sought, the counts define a current-limiting "circuit breaker," and utility as a "circuit breaker" must be demonstrated by the tests for those tests to constitute a reduction to practice. The board found those tests inadequate to demonstrate such utility, and we are fully satisfied that its conclusion is free of error.

Appellant advances each of his tests as a reduction to practice although ordinary common sense, as well as adverse opinions expressed by his own witnesses, shows that it is unreasonable to so characterize most of them. The tests of Exhibits 17, 18 and 21, for example, were in the 7 to 13 volt range, which is hopelessly out of line with that which would be employed in any normal use of a circuit breaker of the defined construction. Moreover, those tests were only of parts of the breaker. The tests described in Exhibit 22, where one semistationary contact latched open in only one of two shots, and the tripping mechanism for the movable contacts failed to operate, were obviously unsuccessful. This is true also of the Exhibit 25 tests which had to be discontinued because of the practically inoperable mechanical condition of the breaker. The final test of March 16, 1956, which resulted in the breaker being "completely burned," in the words of Koval, was a complete failure and may well have been a cause of the cessation of testing.

We are inclined to agree with appellant that the tests reported in Exhibits

---

4. Appellant implied at oral hearing that some unspecified arguments made by appellee were not relied on by the board and hence are not proper issues to be considered here in the absence of a cross appeal. However, appellant did not demonstrate or even argue that appellee presents any issues not raised before the

23 and 24 employed reasonable in-use conditions of 240, 277 and 595 volts and 5,000 and 10,000 amperes of fault current. However, those tests at most demonstrate only successful interruption. The National Electrical Manufacturer's Association defines a circuit breaker in general terms as "a device for closing and interrupting a circuit between separable contacts under both normal and abnormal conditions." [5] We are convinced that appellant's tests failed to prove utility as a circuit breaker which must be capable of reclosure as noted by both the board and appellee.

Appellant's witness Hobson, an engineer with General Electric Company, agreed on cross-examination that a circuit breaker would have no utility if "it was not capable of being closed in on a fault." As pointed out by appellee, Koval testified that his device was not subjected to even one closing on a faulted line. Appellant does not argue or point to any

evidence tending to prove that such a test operation is not necessary. Koval did attempt to explain why the test was not performed, and while that explanation is not particularly clear because he had some difficulty with the English language, it seems that he actually considered the test necessary but had merely postponed it. We agree with appellee that the Koval tests were insufficient for this reason.

The record supports the board's conclusion and appellee's assertion that the utility of the Koval device in the intended functional setting was not established by the tests relied upon by appellant for actual reduction to practice of the invention of the counts in issue. The decision of the board awarding priority to Bodenschatz is therefore affirmed, and it is unnecessary to consider various other arguments presented by appellee in support of the board's conclusion.

Affirmed.

board, and we find no reason for refusing to consider any of appellee's arguments. See Myers v. Feigelman, 455 F.2d 596, 604, 59 CCPA (1959); Klemperer v. Price, 271 F.2d 743, 47 CCPA 729

(1959). Some, in fact, find clear expression in the board's opinion.

5. A document setting forth the standards established by this association is in evidence as appellee's Exhibit 1.