**Fred B. STENCEL et al., Appellants,**

v.

**Louis R. NORDINE, Appellee.**

**Patent Appeal No. 8948.**

United States Court of Customs
and Patent Appeals.

Aug. 2, 1973.

Donald A. Kaul, Washington, D. C., attorney of record, for appellants; Roylance, Abrams, Berdo & Kaul, Washington, D. C., of counsel.

Harrison E. McCandlish, Arlington, Va., attorney of record, for appellee; John D. Nies, Arlington, Va. (Strauch, Nolan, Neale, Nies & Kurz, Arlington, Va.), of counsel.

Before MARKEY, Chief Judge, RICH, BALDWIN and LANE, Judges, and ALMOND, Senior Judge.

LANE, Judge.

This is an appeal from the decision of the Board of Patent Interferences

awarding priority of invention of the subject matter of the three counts in interference to the junior party Nordine. The senior party, Stencel et al. (Stencel), is involved on U. S. Patent No. 3,281,098 which issued October 25, 1966, on application Serial No. 439,568 filed March 15, 1965. Nordine is involved on application Serial No. 470,111 filed July 7, 1965, as a joint invention of Nordine and another, later converted to the sole inventorship of Nordine. Stencel rested on the filing date of its patent as a constructive reduction to practice. Nordine took testimony and introduced evidence in an effort to establish prior conception and actual reduction to practice. The board held that Nordine had actually reduced the invention of the counts to practice prior to Stencel's filing date and accordingly awarded priority to Nordine. We agree and affirm the board's decision.

### The Invention

The invention is a so-called "fail-safe parachute apparatus" which structurally is a combination of means for ballistically spreading a parachute canopy, to which we shall refer as the "ballistic system," and a fail-safe or back-up system designed to enable the parachutist to free the canopy in the event of malfunctioning of the ballistic system. Although the overall combination is in existence at all times, the operation of either system is alternative to the other. The systems are never both operating since when the ballistic system is functioning properly, the back-up system is not in use, and, likewise, the back-up system only operates when the ballistic system does not.

There is no need in this case to go into great detail concerning the structure and operation of the respective ballistic and fail-safe systems. Ballistic spreaders per se were apparently known in the art prior to the invention of the present apparatus. The ballistic spreading of a parachute is accomplished by actuating an explosive charge which propels a series of projectiles radially outward to open the canopy. The parachutist is able to manipulate means accessible to him so as to set off the explosive charge. In the event of a failure of the charge to explode, continued manipulation of said means apparently frees the projectiles and the canopy is then able to spread aerodynamically.

Count 1 defines an apparatus consisting of a parachute canopy and the two systems discussed above. Counts 3 and 4 do not require the canopy and are directed to the combination of the ballistic and fail-safe systems which form a canopy-spreading device. Count 1 is reproduced below. It is to be noted that the power means, projectiles, and actuating means comprise the ballistic system while the releasable restraining means and control means comprise the fail-safe system.

1. In a fail-safe parachute apparatus, the combination of a parachute canopy;

means for connecting said canopy operatively to a load for suspension of the load from the canopy when the canopy has been spread;

a power operated canopy spreading device comprising power means;

a plurality of projectiles connected to said canopy and occupying an initial position on said spreading device and arranged to be projected radially outwardly therefrom, to positively spread said canopy, as a result of actuation of said power means;

actuating means operatively arranged to actuate said power means in response to an actuating input; and

releasable restraining means operatively arranged to retain said projectiles in said initial position prior to actuation of said power means; and

control means connected to said actuating means and to said restraining means and operative to release said restraining means, thereby freeing said projectiles, whenever an actuating input is supplied to said actuating means.

*Nordine's Case for Reduction to Practice*

The board initially found as follows:

The record * * * establishes, and it is not controverted that beginning in 1963 and continuing to completion in 1964 at least five prototypes or structures were built embodying the concept of Nordine and were tested in various ways. Except as specifically noted hereinafter, it is clearly apparent that Nordine's conception and the structures embodying it support every element of structure required by the counts in issue.

At Nordine's instance, the board limited consideration to prototype numbers 1, 4 and 5.

Steps were taken to render the ballistic system of prototype 1 inoperative so as to test the back-up system. The board noted that:

These tests were performed [between March and May 1964] by suspending the parachute assembly to be tested with an attached appropriate weight from a T6 airplane which was flown over the desired drop zone where the parachute was released and then observed to determine whether or not it opened. * * *

Nordine's testimony was to the effect that the last three tests, in that series of six, were successful and that, for the tests he observed, he actually saw the parachutes open. He testified that the three failures were not attributable to the invention under test but due to the equipment used to conduct the tests. He regarded the tests series as successful because each time that the system was actually tested, it did work.

Prototypes 4 and 5 were tested between July and December 1964. The board said:

Certain of these tests * * * were ground tests which tested only the ballistic mode of operation of those prototypes. In addition there were some ground tests to test the backup mode of operation but during these tests the prototypes did not contain any ballistic charge. They were deliberately disabled.

These were successful in that the canopy spread. A series of air-drop tests were conducted. Of these, the board stated:

Nordine relies on the noted tests performed on November 13, November 19, December 1, and December 4, 1964, all of which he regards as demonstrating the successful operation of the backup on the prototype assembly of Exh. 6.

In all of these tests except that on December 4, 1964, the ballistic mode was deliberately disabled by the omission of the ballistics from the system tested. This was done to insure the testing of the backup mode, " . . . to show that the parachute is fail-safe."

With respect to the test conducted on December 4th, the board said as follows:

[Johnson, who packed the parachute,] testified that the test on December 4, 1964 was to have been a ballistic test; that he acted as a ground observer and recoverer in that test; that he saw the parachute open; and that upon examination of the equipment after it landed it was found that a part of the firing mechanism had broken off and that the backup mechanical system had operated to permit the parachute to open. He testified that Nordine was in the aircraft with the pilot Griffiths; that the plane was landed just opposite him with the test load; and that Nordine got out " . . . and came over and we examined the test equipment together" and Nordine "took the firing pin apart and removed the live cartridge." * * * He recalled this as the *last* test.

Nordine urged that the testing was both successful and adequate for reduction to practice. The board agreed.

## OPINION

Stencel asserts that the testing conducted by Nordine was insufficient for a reduction to practice for various reasons. Stencel argues that with the exception of the December 4th test, none of the tests were performed on a device having all of the elements of the counts. Testing of prototype 1 is criticized since the ballistic system was inoperative. Testing of prototypes 4 and 5 is criticized since in any given test either the ballistic system was inoperative or the fail-safe system was not tested, i.e., the ballistic system was operative and therefore the fail-safe system did not come into play. The December 4th test is conceded to have been one in which all of the elements of the count were met by the device being tested, but Stencel argues that the test was a failure since the ballistic system did not work. The board agreed that the December 4th test was the only one in which all of the elements were present, but considered the totality of testing to establish reduction to practice.

Stencel additionally argues that none of the tests were full-flight tests and contends that such full-flight testing was necessary. The air-drop testing is urged not to have been comparable to full-flight testing.

We first note that the board correctly found that a device upon which the counts read was constructed. This does not appear to be controverted. Testing to determine that the device works is separate from actually constructing the device. Hence, although Stencel argues that the complete device was not tested, it is a fact that a complete device was built.

■ We think that the testing here proves that the invention will perform satisfactorily in the intended functional setting. See Koval v. Bodenschatz, 463 F.2d 442, 447, 59 CCPA ——, —— (1972). We do not agree that an invention such as that defined by the involved counts must necessarily be tested under flight conditions as Stencel suggests, compare Williams v. NASA, 463 F.2d 1391, 59 CCPA —— (1972), although there must be a relationship between the test conditions and the intended functional setting. Koval v. Bodenschatz, supra. The totality of testing must be considered to ascertain whether or not the standards have been met. See Voisinet v. Coglianese, 455 F.2d 1064, 1068, 59 CCPA ——, —— (1972).

We think that the board correctly assessed the totality of testing. The board viewed the ground testing of the ballistic system as sufficient to establish the operability of that system. We find no error in that conclusion. Referring to the air-drop testing of the back-up system, the board found that the structure functioned as intended. We agree that that testing established the suitability of the back-up system. Although the December 4th test is regarded by Stencel as a failure, we view it as properly giving rise to a strong conviction of the success of the back-up system. However inadvertently it happened, that test brought the back-up system into the precise functional setting intended, accidental miscue of the ballistic system, and demonstrated that the back-up system could be expected to function in that setting.

On the subject of full-flight testing versus air-drop testing, we hold that the test conditions sufficiently simulated actual use conditions to lead reasonably to the conclusion that success under the test conditions could be extrapolated to success under actual conditions.

Stencel additionally urges that Nordine's testimony relative to the December 4th test lacks corroboration. The board viewed the testimony of Johnson and the pilot, Griffiths, as adequate corroboration. Stencel attempts to discredit the testimony of these witnesses. We think Stencel's contentions are strained. We are not disposed to disbelieve Johnson's testimony as Stencel implicitly

**920**

urges we do. We think the board correctly found that there was adequate corroboration for the last test.

■ We have carefully considered the record before us and the arguments advanced by Stencel in its brief and at oral hearing. However, we find no error in the board's conclusions.

Stencel filed a motion to assess part of the cost of printing of the record to Nordine. Nordine had supplemented the record which had been ordered by Stencel. The court deferred consideration of Stencel's motion until this decision.

Stencel contends that the material added by Nordine could not have been expected to be either necessary or useful to the court in resolving the issues on appeal. Stencel states that the appeal has been based "upon the fact that Appellee's testing was *not* adequate to show actual reduction to practice and that the final test was *not* adequately corroborated."

Nordine argues that the material added was "reasonably necessary for a proper determination of all the issues raised by Appellants' Reasons for Appeal." Nordine contends that we should look to the Reasons of Appeal rather than the issues ultimately argued by Stencel in its brief. Nordine points to Reason of Appeal #2, which asserts error on the board's part in "holding that Nordine's conception and the structures embodying it support every element of structure required by the counts."

Nordine's additions to the record were fairly selective, albeit extensive, and it is our impression that reasonable prudence on Nordine's part justified those additions. See Cosmetically Yours, Inc. v. Clairol, Inc., 424 F.2d 1385, 1388, 56 CCPA 1071, 1073 (1970). Stencel has not pointed to specific additions with an explanation of the inappropriateness of their inclusion in the record. Nordine has shown that the additions in general were prompted by Stencel's Reasons of Appeal. Under the circumstances, we will not assess any

part of the cost of printing to Nordine. Stencel's motion is accordingly denied.

For the reasons set forth herein, the decision of the board is affirmed.

Affirmed.